DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

CARLYLE BRYAN, JULIE BEBERMAN,           )
and CHARLES FRANCIS,                     )
                                         )
            *Plaintiffs,*                )
                                         )
        v.                               )        Civil Action No. 2010-0066
                                         )
UNITED STATES OF AMERICA, and            )
CUSTOMS AND BORDER PROTECTION            )
OFFICERS JOHN MAZUR, JAMIE               )
DEMARAIS, OBED TORRES, GREGORY           )
DeFELICE, ORLANDO BAEZ,                  )
TIMOTHY OGG, ANDRES VAZQUEZ,             )
JOEL OSORIO, and JUAN GRACIA,            )
OF THE DEPARTMENT OF HOMELAND            )
SECURITY, BUREAU OF CUSTOMS              )
AND BORDER PROTECTION,                   )
                                         )
            *Defendants.*                )
_____)

**David M. Nissman, Esq.,**
St. Croix, U.S.V.I.
        *For Plaintiffs*

**Joycelyn Hewlett, Esq.,**
St. Thomas, U.S.V.I.
        *For Defendants*

## MEMORANDUM OPINION

**Lewis, Chief Judge**

THIS MATTER comes before the Court on the Motion to Dismiss First Amended

Complaint (Dkt. No. 50) and the Motion for Summary Judgment (Dkt. No. 94) filed by Defendants

United States of America and ten officers of the Department of Homeland Security's Bureau of

Customs and Border Protection ("CBP") (collectively "Defendants" or "United States"). Plaintiffs

opposed both motions (Dkt. Nos. 56 and 104), and Defendants filed Replies in support of both motions. (Dkt. Nos. 58, 111).

As discussed further below, with one exception—a statute of limitations argument—the issues raised by Defendants in the Motion to Dismiss are included in the Motion for Summary Judgment with, of course, more factual development in the Motion for Summary Judgment. In view of this similarity and the Court's ruling on Defendants' qualified immunity argument, which renders the statute of limitations argument moot, the Court will deny the Motion to Dismiss as moot and address all of the issues in the context of the Motion for Summary Judgment.[1]

For the reasons that follow, the Court will grant Defendants' Motion for Summary Judgment. It will dismiss Count Four, brought against the individual CBP Officers pursuant to *Bivens v. Six Unknown Named Agents of the Fed. Bur. of Narcotics,* 403 U.S. 388 (1971), on the ground of qualified immunity.[2] Further, the Court will dismiss Counts One, Two, and Three, brought against the United States pursuant to the Federal Tort Claims Act ("FTCA"), on the ground that the discretionary function exception divests the Court of jurisdiction over these causes of action.[3]

---

[1] Plaintiffs raise a "law of the case" argument in their Opposition to the Motion to Dismiss that is not raised in their Opposition to the Motion for Summary Judgment. Plaintiffs' argument in that regard is addressed in footnote 11, *infra.*

[2] Although the Court has found that it has personal jurisdiction over Defendant Ogg, *see infra* pp. 20-21, the Court has granted summary judgment to the individual Defendants on Count Four—the only claim in which Ogg is named.

[3] On January 27, 2017, the Court issued a Memorandum Opinion and Order that ordered the unsealing of certain documents in this case that had been placed under seal pursuant to a Protective Order and the filing of redacted copies of other documents that had been placed under seal. (Dkt. No. 166). Defendants refiled the redacted documents on February 3, 2017. (Dkt. Nos. 167, 168). In addition, pursuant to a subsequent Court Order (Dkt. No. 169), Defendants refiled Defendant Timothy Ogg's deposition testimony with additional pages unsealed. (Dkt. No. 170). The citations to the docket in this Memorandum Opinion are to the unsealed documents; to the refiled, redacted

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

Carlyle Bryan ("Bryan"), Julie Beberman ("Beberman"), and Charles Francis ("Francis") (collectively "Plaintiffs") are United States citizens who are residents of St. Croix, U.S. Virgin Islands. (Dkt. No. 38, ¶ 3). In December 2007, Beberman booked two cabins on the cruise ship M/V Adventure of the Seas ("M/V AOS"), owned by Royal Caribbean Cruises, Ltd.—one cabin for herself and her boyfriend Bryan, and the other for Francis. *Id.* ¶¶ 5, 6. She had invited Francis as a bonus for his performance as an independent contractor for Oil Genie, a business she owned. (Dkt. No. 168-1 at 10). The cruise began on August 31, 2008 in San Juan, Puerto Rico, stopped at several foreign ports, returned to the United States through St. Thomas, U.S. Virgin Islands, and ended back in San Juan on September 7, 2008. (Dkt. No. 97-13 at 2).

### A. Customs Inspection at the San Juan Airport

Plaintiffs flew from St. Croix to San Juan on August 31, 2008. Upon their arrival at the San Juan Airport, they passed through a border inspection checkpoint where they were asked the purpose of their visit and where they worked on St. Croix. (Dkt. No. 38, ¶¶ 7-9). Francis recalled that he was not nervous when he went through Customs, and had no problem answering the CBP officer's questions, except for the inquiry concerning his occupation. Francis explained that the question was "hard to answer" because the mobile oil change business for which he worked involved driving to a customer's location and performing an oil change there. Because no one had asked him the question before, he stated that it took him "a little longer to answer[.]" (Dkt. No. 108-7 at 6).

---

documents; as well as to certain other sensitive documents that remain under seal but portions of which are "deemed unsealed" (*see* Dkt. No. 166) to the extent the Memorandum Opinion quotes or summarizes discrete sections from them.

The CBP officers conducted a secondary inspection of Francis. One officer found a silver canister in Francis' bag and asked what it contained. Francis responded that it was his shaving powder, and that the officer should open it slowly. *Id.* at 4. The officer popped the cover off the canister and powder flew out across the room, covering the inspection area and the CBP officers, and causing them to sneeze and cough. Plaintiffs found the situation humorous but the CBP officers did not. (Dkt. No. 167-6, ¶¶ 9, 11). The officers found no contraband in Francis' luggage. *Id.* ¶ 12.

Defendant Orlando Baez ("Baez"), a CBP officer at the San Juan airport, did not recall the search and the shaving powder incident. However, he knew that he was involved in the secondary inspection of Francis because, on September 1, 2008, he authored an entry in the TECS system[4] concerning that inspection. (Dkt. No. 167-3 at 5, 7). The entry stated that: Francis had arrived at the San Juan airport from St. Croix; Francis was "disoriented and nervous[s]" and it took him some time to answer a question about his profession; a bag exam was conducted with negative results; Francis would be aboard the M/V AOS until September 7, 2008; and Francis was traveling with Bryan and Beberman. (Dkt. No. 97-6 at 20). Baez stated. "what I wrote is what I saw. I saw this person that was acting, you know, disoriented and nervous. And that's what I wrote." (Dkt. No. 107-8 at 4; Dkt. No. 167-6, ¶ 13). Between August 31, 2008 and September 5, 2008, Plaintiffs traveled to Barbados, St. Lucia, Antigua, and St. Maarten on the cruise. (Dkt. No. 97-13 at 2).

---

[4] The TECS database is an updated and modified version of the former Treasury Enforcement Communications System. It is principally owned and managed by CBP, and is its principal law enforcement and anti-terrorism database. Among other things, TECS serves as a data repository to support law enforcement "lookouts," border screenings, and reporting for CBP's primary and secondary inspection processes. (Dkt. No. 97-2 at 2; Dkt. No. 97-3 at 3).

**B.  Creation of the "Lookouts"**

Defendant CBP officer Timothy Ogg ("Ogg") worked in the Seaport Rover Team's Passenger Analytical Unit ("PAU") in San Juan. His desk was located next to Defendant Baez's desk. (Dkt. No. 167-6, ¶ 14). Ogg reviewed passenger lists for cruise ships arriving each week in San Juan and searched law enforcement databases to ascertain if any passengers' names appeared on those databases. If so, he would determine whether any of the passengers should be targeted for border inspection. (Dkt. No. 170-1 at 5, 7; Dkt. No. 167-5, ¶ 15). Ogg began his review of the M/V AOS manifold at the beginning of the week and concluded his analysis by Thursday or Friday, September 4 or 5, 2008. (Dkt. No. 170-1 at 27). He knew that the M/V AOS traveled to high-risk narcotics trafficking countries prior to docking in St. Thomas and San Juan, and that the CBP had seized narcotics from crew members and passengers numerous times in the past. *Id.* at 24. He also knew that Bryan, Francis, and Beberman were traveling together. (Dkt. No. 167-3 at 18, 20).

Ogg testified that, in conjunction with checking the M/V AOS manifold of the ship's 3000-plus passengers, he reviewed a TECS report on Bryan dated April 30, 2000, written by Immigration & Customs Enforcement ("ICE") Agent Hillary Hodge. That report contained subsequent remarks dated May 17, 2000, stating: "Subject is associates [sic] with suspected drug smugglers within the US Virgin Islands. Subject is also suspected of smuggling narcotics within the Virgin Islands. If encountered, conduct 100% exam. . ." (Dkt. No. 97-6 at 4; Dkt. No. 167-3 at 14). Ogg stated that he knew Agent Hodge very well, regarded him as an "excellent worker," and that "if he put something in the system, I want to take a look at it." (Dkt. No. 170-1 at 8). Ogg also viewed a St. Croix PAU lookout entry from June 2, 2004 stating that Bryan would be arriving by airplane from St. Maarten. The 2004 entry referred to the 2000 St. Thomas TECS record indicating that Bryan was a "suspect in USVI drug smuggling," and asked agents reading the report to "[p]lease

document co-travelers, employment and reason for travel[.]" (Dkt. No. 108-18 at 67; Dkt. No. 167-6, ¶ 25).[5]

In addition, Ogg found two records of interest in the TECS system concerning Charles Francis. The first record, dated February 23, 2006, stated in the "Status" section: "Subject of current interest," and in the "Remarks" section: "Subject of DEA indictment. If encountered, please notify [a particular special agent via a particular telephone number]. Additionally, make copies of all itinerary information and identification documents." (Dkt. No. 97-6 at 22). Ogg also viewed a record entered on March 2, 2006 which stated in the Status section, "Previous suspect, closed case" and in the "Remarks" section, "Subject of DEA indictment. If encountered, please notify [a particular special agent]." (Dkt. No. 97-6 at 21; Dkt. No. 167-6, ¶ 22).

At some point on September 5, 2008, Ogg made the following "Customs one day lookout" entry into the TECS system regarding Bryan:

> Passenger arriving on board M/V Adventure of the Seas. Arriving to STT [St. Thomas] on 09/06/08 and San Juan 09/07/08. Subject linked to drug smuggling organization in STT. Traveling with Francis Charles and Beberman Julie. 100% exam cabins 8330/8332.

(Dkt. No. 97-6 at 2). The start date of the lookout was September 5, 2008 and the end date was September 8, 2008. *Id.* Ogg placed the same "Customs one day lookout" on Beberman, changing only the names of the people with whom she was traveling. (Dkt. No. 97-6 at 11).

Ogg's "Customs one day lookout" entry concerning Francis contained a slightly different text:

> Arrived on Seaboarn [sic] flight from STT to board M/V Adventure OTS. Passenger under investigation for drug smuggling. Traveling with Bryan Carlyle and Julie Beberman. 100% examination recommended[.] Consider all methods of concealment.

---

[5] The record contains no underlying evidence of any link between Bryan and drug smuggling.

(Dkt. No. 97-6 at 18). Ogg stated that he did not see or rely upon the secondary inspection remarks about Francis made by Officer Baez on September 1 when he created the lookouts.  (Dkt. No. 170-1 at 11; Dkt. No. 167-6, ¶ 16).

When asked at his deposition why he generated these lookouts, Ogg responded that, while the TECS record concerning Bryan was old, the entry concerning Francis was not. He explained that if one case, by itself, was old and there were no convictions, he could have made a different determination in terms of creating a lookout. But, in this case, "[w]hen I got two different agencies with two different cases, one is not as old as the other one, that's, for me, is a clear lookout. I want to see what's going on." (Dkt. No. 170-1 at 25-26). He added that even though the records for Bryan and Francis were not linked together, one of the TECS records was generated by an agent that he knew, and both had narcotics records from different agencies: Francis had "an indictment by DEA, and I have an ICE agent over here [Hodge] wants to check this person [Bryan]." Considering all that information, Ogg posted the lookouts because "all we want to do is make sure what's going on with these passengers." (*Id.* at 26; *see id.* at 16). He "relied specifically on the records that are in the system" with regard to Bryan and Francis, and observed that, even if an investigation may be closed concerning a person in whom he is interested, "it's not closed for me" and he could still inspect the person.  (*Id.* at 16, 17).

Ogg also explained why he placed a lookout on Julie Beberman. He found it significant that the two people with whom she was traveling had TECS records and therefore wanted to check her too. He asserted that people in the same cabin traveling together would sometimes submit only one Customs Declaration form, which would allow those not submitting the form to avoid inspection. (*Id.* at 22-23, 30-31). In this regard, he wanted "to make sure that when they go through secondary and she fills out a Custom Declaration, [the others] don't get by." (*Id.* at 14-15). He did

not have any information to believe that Beberman had any connection to the St. Thomas drug smuggling organization he had referred to in the Bryan and Beberman lookouts, but stated that "When I say 'linked', she's traveling with Charles Francis that was indicted by DEA and . . . Carlyle Bryan, which also has a record for possible narcotics or – in St. Thomas. . . [T]hat's why I put the lookouts in the system to see if she does. That's why the records are generated. It's three passengers. We want to check them, all three." (*Id.* at 9).[6]

Ogg knew that the lookouts would lead to a room inspection, and stated that he intended that the inspection take place in San Juan, not St. Thomas. (*Id.* at 21). Although the lookouts spanned September 5-8, Ogg noted that because September 6 and 7 fell on Saturday and Sunday, he had to extend the lookouts to Monday, September 8th, so that they would not be erased from the system. (*Id.* at 29).

### C. The September 6, 2008 Cabin Search on St. Thomas

On Saturday, September 6, 2008, at approximately 7:30 a.m., Defendant CBP officers Mazur, Demarais, Torres, DeFelice, and Santiago—uniformed members of the Anti-Terrorism Contraband Enforcement Team—performed a search of Plaintiffs' cabins, which were the only cabins on the M/V AOS searched that day. (Dkt. No. 108-7 at 10; Dkt. No. 167-4 at 4; Dkt. No.

---

[6] Ogg testified as follows: "So both records [Bryan and Francis] combined are what makes me come to this [putting a TECS alert]. Just Julie Beberman happened to travel together with these two persons. . . . [A]fter I create these records . . . we want to make sure we got results for these records. . . .  And on the Customs Declaration if three people are traveling together, and if for any reason we don't go to the cabin and inspect it, Julie Beberman can fill out the declaration with two persons accompanying her and I don't get their names on the Declaration. So, if I don't put her on the list and they go through secondary, they could go without inspection. Anybody. Not only them, just anybody. So the only people we don't touch are minors. . . . But if there's a family traveling, and this person is wanted for whatever reason, we got to include her in the lookout because we want to make sure we don't lose this person, because her name would be on the list. And whenever the person is in secondary, receives the letter and doesn't see his name is going to let him go. That's why we have to include Julie Beberman." (Dkt. No. 170-1 at 22-23).

167-6, ¶ 51). The CBP officers knocked on the cabin doors, which were then opened. Bryan and

Beberman had to get dressed with the door ajar,[7] and they were not allowed to use the bathroom.

(Dkt. No. 167-6, ¶¶ 55, 56; Dkt. No. 167-5, ¶ 48). Francis, who traveled in a separate cabin, stated

that the officers knocked on his door and the door opened. He was standing naked in the room.

The officers informed him they were conducting a random search, told him to put on his clothes,

and also told him not to go into the bathroom. They watched him as he got dressed. (Dkt. No. 108-

7 at 9-14, 24; Dkt. No. 167-6, ¶ 55). Plaintiffs were ordered outside their cabins and told to stand

against a wall in the hallway. An officer with a dog went into the cabins and searched their personal

effects. (Dkt. No. 167-6, ¶ 58). Plaintiffs were not allowed to observe the search. *Id.* Following the

search, Bryan reported that the sheets were full of dog hair; Beberman asserted that "stuff was

strewn around from the suitcases"; and Francis observed that there was nothing upsetting about

the appearance of his cabin. (Dkt. No. 168-1 at 23; Dkt. No. 168-2 at 14-15; Dkt. No. 97-5 at 20).

Beberman estimated that they were in the hallway for two to five minutes while the dog

searched the cabin; Bryan estimated the entire incident took between five and ten minutes; and

Francis estimated he was in the hallway for two or three minutes while his room was searched.

(Dkt. No. 168-1 at 22; Dkt. No. 168-2 at 14; Dkt. No. 97-5 at 15).

The CBP officers created TECS records for Plaintiffs concerning the September 6th search,

showing "negative" results. (Dkt. No. 97-6 at 5, 6, 12, 13, 23, 24).

### D.  The September 7, 2008 Aborted Cabin Search in San Juan

The ship docked in Puerto Rico on September 7, 2008. At 6:45 a.m., CPB officers Vazquez,

Osorio, and Gracia attempted to inspect Plaintiffs' cabins. (Dkt. No. 168-7 at 4; Dkt. No. 167-5, ¶

---

[7] The officers did not watch them as they dressed. (Dkt. No. 167-5, ¶ 48).

64). The CBP officers banged on the door, the cabin doors were opened, and the officers told Bryan, Beberman, and Francis to get dressed and not go into the bathroom. (Dkt. No. 167-5, ¶ 67; Dkt. No. 167-6, ¶ 76). Beberman went to the door in a towel and refused to permit the officers to inspect her room. (Dkt. No. 167-5, ¶ 69) . She was loud and upset. *Id.* ¶ 70. Beberman and Bryan then had a heated discussion about whether to permit the CBP officers into their cabin. *Id.* ¶ 72. An officer came into Francis' cabin without consent and waited for further direction. (Dkt. No. 167-6, ¶ 80). After the CBP officers learned that the rooms had been inspected the previous day on St. Thomas, Supervising CBP officer Gracia decided, based on the totality of the circumstances—including that the rooms were searched the day before, that Beberman was in a towel, was upset and protesting, and that he did not have a female CBP officer with him—not to inspect the cabins. (Dkt. No. 167-5, ¶ 74). Plaintiffs estimate that the September 7th incident took from three to ten minutes. *Id.* ¶ 77.

### E. Procedural History

Plaintiffs filed a Complaint in July 2010, and an Amended Complaint in April 2011. (Dkt. No. 38).[8] They asserted three causes of action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680, alleging invasion of privacy (Count One); false imprisonment (Count Two); and intentional infliction of emotional distress (Count

---

[8] Defendants filed a Motion to Dismiss the original Complaint, which was summarily denied by the Court in a one-sentence Order dated January 24, 2011 (Dkt. No. 26)—the same day the Court granted Plaintiffs' Motion to Amend the original Complaint (Dkt. No. 27). Plaintiffs then moved to vacate the Order granting the Motion to Amend because they mistakenly represented that Defendants were unopposed to the motion and because they wanted to modify their allegations. (Dkt. No. 28). The Court granted that motion on January 26, 2011 (Dkt. No. 29) and Plaintiffs again moved to amend the Complaint on February 3, 2011 (Dkt. No. 30). Although the United States opposed the motion (Dkt. No. 34), the Court granted the Motion to Amend on April 20, 2011 (Dkt. No. 36).

Three). Plaintiffs brought two claims against the individual CPB officers under *Bivens v. Six Unknown Named Agents of the Fed. Bur. of Narcotics*, 403 U.S. 388 (1971), based on the search in St. Thomas on September 6 (Count Four)[9] and the aborted search in San Juan on September 7 (Count Five).[10]

The United States moved to dismiss the First Amended Complaint, arguing that: (1) the discretionary function exception and the customs detention exception to the FTCA divested the Court of subject matter jurisdiction over the FTCA causes of action; (2) the Court lacked personal jurisdiction over the individual Defendants from Puerto Rico (CBP officers Osorio, Vazquez, Gracia, Baez, and Ogg); (3) Plaintiffs failed to state a claim regarding the FTCA causes of action; (4) the statute of limitations bars claims against the Defendants from Puerto Rico; and (5) the two *Bivens* causes of action were barred by qualified immunity. (Dkt. No. 51).

Plaintiffs opposed the Motion to Dismiss. (Dkt. No. 56). In doing so, they conceded that the Court lacked personal jurisdiction over officers Vazquez, Osorio, and Gracia, and requested dismissal without prejudice of Count Five—the second *Bivens* claim concerning the aborted September 7, 2008 cabin search in San Juan. *Id.* at 14.[11]

---

[9] The Count Four *Bivens* claim was asserted against CBP officers Mazur, Demarais, Torres, DeFelice, Santiago, Baez and Ogg.

[10] Count Five—asserted against CBP officers Vazquez, Osorio, Gracia, Baez and Ogg—was dismissed at Plaintiffs' request. *See infra* p. 12.

[11] Plaintiffs make a passing argument in their Opposition to Defendants' Motion to Dismiss the First Amended Complaint that the "law of the case doctrine" bars the Court from reopening what was already decided in its Order denying the Motion to Dismiss the original Complaint—*i.e.*, the Court should not revisit its earlier ruling which did not dismiss Plaintiffs' claims. (Dkt. No. 56 at 14). The law of the case doctrine "'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Young v. Smith*, 2016 WL 3522965, at *10 (M.D. Pa. June 28, 2016) (quoting *Farina v. Nokia Inc.*, 625 F.3d 97, 117 n.21 (3d Cir. 2010)). The Order denying the Motion to Dismiss was entered on the same day that the Court granted Plaintiffs' Motion to Amend their Complaint (Dkt. Nos. 26, 27), which would have rendered the denial appropriate on grounds of mootness. *See, e.g., United States of*

In September 2011, the United States filed the instant Motion for Summary Judgment. (Dkt. No. 94). The Motion raises most of the arguments proffered in the Motion to Dismiss: that the discretionary function exception and customs detention exception bar the FTCA causes of action; that the Court lacks personal jurisdiction over Officers Baez and Ogg; that Plaintiffs did not meet their burden of proof on the FTCA claims; and that Count Four was barred by qualified immunity. (Dkt. No. 95). The United States does not reiterate its statute of limitations argument—raised in its Motion to Dismiss—in its Motion for Summary Judgment. It does, however, add an argument that the searches were constitutional because they were reasonable. *Id.* at 3-6. Plaintiffs opposed the Motion (Dkt. No. 104), and Defendants filed a Reply (Dkt. No. 111).

The Court heard oral argument on the Motion for Summary Judgment. During the oral argument, the Court granted Plaintiffs' request to dismiss Count Five without prejudice, and took the remaining issues under advisement.

---

*Am. for the Use of Heavy Materials, LLC v. Tip Top Constr. Corp.*, 2016 WL 2992116, at *8 n.16 (D.V.I. May 20, 2016) (observing that because first amended complaint was the operative pleading in the case, Court would deny as moot defendant's motion to dismiss the original complaint) (citing, *inter alia, W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 171 (3d Cir. 2013) (stating that an amended complaint functions as operative complaint and supersedes prior complaint in its entirety)). In any event, the Order denying the initial Motion to Dismiss was a one-line summary denial. *See* Dkt. No. 26 ("AND NOW, this 24th day of January, 2011, upon consideration of the Federal Defendants' Motion to Dismiss (Document No. 10), the plaintiffs' response and the defendants' reply, it is ORDERED that the motion is DENIED."). Even if the Court had made findings, which it did not do here, the law of the case doctrine would still be inapplicable. *See Hawksbill Sea Turtle v. Fed. Emergency Mgmt. Agency*, 126 F.3d 461, 474 n.11 (3d Cir. 1997) ("Judge's findings, 'which are addressed to the preliminary motion to dismiss, are not 'the law of the case[,]' . . . do not control the issues. . . upcoming in connection with the motions for summary judgment.'") (quoting *Zenith Radio Corp. v. Matsushita Elec. Ind. Co.*, 505 F. Supp. 1125, 1185 (E.D. Pa. 1980); *see also Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994) ("Interlocutory orders, including denials of motions to dismiss, remain open to trial court reconsideration, and do not constitute the law of the case."). Thus, Plaintiffs' argument to the contrary is rejected.

## II.   SUMMARY JUDGMENT STANDARD

To prevail on a motion for summary judgment, a movant must show that there is "no genuine dispute as to any material fact," and that, on the uncontroverted facts, it is "entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Bonkowski v. Oberg Indus.*, 787 F.3d 190, 195 n.1 (3d Cir. 2015). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Mahoney v. McDonnell*, 2015 U.S. App. LEXIS 10662, at *10 (3d Cir. June 24, 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party has met this burden, the non-moving party "must set forth specific facts showing a genuine issue for trial and may not rest upon mere allegations, general denials, or . . . vague statements." *Patterson v. Glory Foods, Inc.*, 555 F. App'x 207, 211 (3d Cir. 2014) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991) (internal quotation marks omitted; alteration in original)); *see also* FED. R. CIV. P. 56(c).

In reviewing a motion for summary judgment, "[a]ll facts are viewed in the light most favorable to the non-moving party, who is 'entitled to every reasonable inference that can be drawn from the record.'" *Seamans v. Temple Univ.*, 744 F.3d 853, 859 (3d Cir. 2014) (quoting *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000)). In addition, "at the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder." *Anderson v. Warden of Berks Cnty. Prison*, 602 F. App'x 892, 895 (3d Cir. 2015) (quoting *Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1993) (internal quotation marks omitted)).

The role of the court is to "determine whether there is a genuine issue for trial." *Stiegel v. Peters Twp.*, 600 F. App'x 60, 63 (3d Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (internal quotation marks omitted)). A genuine issue of material fact exists

when the fact-finder, viewing the record evidence, could rationally find in favor of the non-moving party. *See Anderson*, 477 U.S. at 248. When a genuine issue of material fact exists, summary judgment is inappropriate. *See Fontroy v. Beard*, 559 F.3d 173, 182 (3d Cir. 2009) (citations omitted).

## III.  DISCUSSION

### A.  Personal Jurisdiction over CBP Officers Baez and Ogg

#### 1.  Procedural Background

In its Motion to Dismiss the First Amended Complaint, the United States argued that the Court lacks personal jurisdiction over the individual Defendants from Puerto Rico.[12] (Dkt. No. 51 at 9-11). It claimed that none of those Defendants had connections to the Virgin Islands to support a finding of personal jurisdiction, citing Unsworn Declarations to that effect from each of those Defendants. *Id.* at 10; Dkt. No. 51-1. Regarding Baez and Ogg, the United States asserted that: entering data into the TECS database from computer terminals located in Puerto Rico, which prompted CBP officers to search Plaintiffs' cabins in St. Thomas, was not sufficient to satisfy the Virgin Islands Long-Arm Statute; the exercise of jurisdiction would not comport with Baez's and Ogg's due process rights; and Baez and Ogg lacked the contacts with the Virgin Islands to satisfy personal jurisdiction. (Dkt. No. 51 at 10). In addition, the United States claimed that Plaintiffs could not establish personal jurisdiction over Baez and Ogg based on the three-pronged "effects test" set forth in *Calder v. Jones*, 465 U.S. 783 (1984), because the conduct alleged was not expressly aimed at the Virgin Islands. *Id.* at 11.

---

[12] As indicated above, the individual Defendants from Puerto Rico were CBP Officers Osorio, Vazquez, Gracia, Baez, and Ogg. Since Count Five—the only substantive count which named Osorio, Vazquez, and Gracia—was dismissed at oral argument at Plaintiffs' request, the only remaining Defendants from Puerto Rico to which the personal jurisdiction argument applies—in relation to Count Four—are Baez and Ogg.

In their Opposition to the Motion to Dismiss, Plaintiffs argued that they should be allowed jurisdictional discovery before the Court considered whether it had jurisdiction over Baez and Ogg. (Dkt. No. 56 at 9). Their theory was that both Baez and Ogg intentionally entered false information into the TECS database with the intent to have Plaintiffs' cabins searched during the cruise. They sought discovery to prove that the information the officers entered was false. *Id.* at 11-13.

Discovery took place after Defendants filed their Motion to Dismiss. Five months later, Defendants filed the instant Motion for Summary Judgment. In their Motion, Defendants again argued that the Court lacked personal jurisdiction over Baez and Ogg. Defendants added certain facts elicited during discovery, including that Baez did not cause any tortious injury in the Virgin Islands because Ogg did not review or rely on Baez's report in TECS when Ogg placed the lookouts on Plaintiffs. (Dkt. No. 95 at 11-12). Defendants argued that because there was no evidence that Ogg utilized the information Baez inputted or that it influenced the decision to search Plaintiffs' cabins, the Court therefore lacked jurisdiction over Baez. (Dkt. No. 95 at 11-12). The United States also contended that Baez did not direct his conduct toward the Virgin Islands, since his comment in TECS, pursuant to agency regulations, provided "general knowledge to any officer who might be reviewing TECS in the future, regardless of where Plaintiffs' travels took them." *Id.*

With regard to Ogg, Defendants asserted that Ogg did not aim any activity at the Virgin Islands, as his testimony made clear that he entered the lookouts with the intention that the cabin inspections take place in Puerto Rico where he and his team were based. Further, Ogg did not know that Plaintiffs' cabins had been inspected on St. Thomas on September 6 until he was told by the Rover Team following the September 7 cancelled inspection. Defendants concluded that because Plaintiffs could not establish a sufficient connection between Ogg and the Virgin Islands, the Court lacked jurisdiction over him as well. *Id.*

15

In their Opposition to the Motion for Summary Judgment, Plaintiffs contended that the Court had personal jurisdiction over both Baez and Ogg. (Dkt. No. 104 at 10-11). They claimed that Baez committed an intentional tort against Francis, as a result of being coated with shaving powder during the San Juan Airport inspection, by making a derogatory comment about Francis in the TECS database and encouraging Officer Ogg to direct that Plaintiffs' cabins be searched. *Id.* at 11. Ogg then "responded to Officer Baez's quest for vengeance by writing further unfounded comments about Plaintiffs in TECS," directing "100% examinations and not[ing] that Plaintiffs would be arriving in St. Thomas on September 6th." *Id.* They posited that Ogg knew that the CBP officers in St. Thomas would review TECS in deciding which cabins to search, and Ogg could have directed searches only in Puerto Rico, but he did not. *Id.* Plaintiffs concluded that, although neither Baez nor Ogg "personally searched Plaintiffs' cabins, their actions caused other CBP Officers to search Plaintiffs' cabins, which makes them aiders and abettors, and gives the Court personal jurisdiction over them." *Id.*

## 2. Analysis

A federal court "generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." *Sinochem Int'l Co., Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007). Accordingly, the Court will address the personal jurisdiction argument first.

"[A] federal district court may assert personal jurisdiction over a nonresident of the state in which the court sits only to the extent authorized by the law of that state." *Harp v. Koury*, 2013 WL 3153780, at *1 (E.D. Pa. June 21, 2013) (citing, *inter alia, DeJames v. Magnificence Carriers, Inc.*, 654 F.2d 280, 283 (3d Cir. 1981)). This Court has interpreted the Virgin Islands Long-Arm Statute "to apply as widely as constitutional requirements permit, consistent with the intent of the

legislature." *Ford v. Amber Cape Prods., LLC*, 2010 WL 3927321, at *3 (D.V.I. Sept. 30, 2010); *see also Unlimited Holdings, Inc. v. Bertram Yacht, Inc.,* 2007 WL 1959166, at *2 (D.V.I. June 22, 2007) (noting the parallel between the Virgin Islands Long-Arm Statute and the due process requirements of the Constitution); *Urgent v. Tech. Assistance Bur., Inc.*, 255 F. Supp. 2d 532, 535 (D.V.I. 2003) ("[B]y adopting the Uniform Act, rather than developing its own long-arm statute or adopting the long-arm statute of some other jurisdiction, the Virgin Islands' Legislature likely intended the reach of the Virgin Islands' long-arm statute to be coextensive with the exercise of personal jurisdiction permitted by the due process clause.").[13] Thus, Virgin Islands law provides for jurisdiction coextensive with that allowed by the Due Process Clause of the Constitution.

Under the Due Process Clause, a court may exercise personal jurisdiction only over defendants who have "certain minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (internal quotation marks omitted). "A parallel inquiry is whether the defendants' contacts with the forum state are such that the defendants should 'reasonably anticipate being haled into court there.'" *Harp*, 2013 WL 3153780, at *2 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

A federal district court may exercise personal jurisdiction over nonresident defendants based on either general jurisdiction or specific jurisdiction. "A court may exercise general jurisdiction over a defendant where he or she has 'continuous and systematic' contacts with the forum, whether or not those contacts are related to the plaintiff's cause of action." *Metcalfe v. Renaissance Marine, Inc.,* 566 F.3d 324, 334 (3d Cir. 2009) (quoting *Helicopteros Nacionales de*

---

[13] In their filings, the parties do not argue whether personal jurisdiction exists under the Long-Arm Statute; rather, they focus on whether the requirements of the *Calder* "effects test," discussed below, applies in order to confer personal jurisdiction.

*Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)). On the other hand, specific jurisdiction "exists if the defendant has 'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). Although the parties do not specifically argue that personal jurisdiction is based on specific or general jurisdiction, it may be inferred that they are arguing specific jurisdiction because both Plaintiffs and Defendants cite the "effects test" in *Calder v. Jones,* 465 U.S. 783 (1984), as either conferring or preventing the exercise of personal jurisdiction over Defendants Baez and Ogg.

Under *Calder*, "a plaintiff may demonstrate specific personal jurisdiction where an intentional tort is alleged" if the plaintiff shows:

> (1) [t]he defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and (3) the defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

*Marten v. Godwin*, 499 F.3d 290, 297 (3d Cir. 2007). Under the *Calder* test, "specific jurisdiction may exist even where the defendant's contacts with the forum state would ordinarily not rise to the level required for due process under the traditional analysis." *Harp,* 2013 WL 3153780, at *3 (quoting *Marten*, 499 F.3d at 297)). However, "[o]nly if the 'expressly aimed' element of the test is met need [a court] consider the other two elements." *Id.*

Here, Plaintiffs allege that Defendant CBP officers Mazur, Demarais Torres, DeFelice and Santiago, aided and abetted by Baez and Ogg, committed the torts of invasion of privacy, false imprisonment, and intentional infliction of emotional distress. The Court first considers whether the third prong of the *Calder* test—that the defendant "expressly aimed his tortious conduct at the [Virgin Islands] such that the [Virgin Islands] can be said to be the focal point of the tortious

18

activity"—is met. *Marten,* 499 F.3d at 297. To establish that a defendant "expressly aimed" his conduct, a plaintiff must demonstrate that '"the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum.'" *Id.* at 297-98 (quoting *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 266 (3d Cir. 1998)). This is an "exacting" standard. *Doe v. Hesketh*, 15 F. Supp. 3d 586, 593 (E.D. Pa. 2014). If a plaintiff fails to show that the defendant '"manifest[ed] behavior intentionally targeted at and focused' on the forum," the plaintiff fails to establish personal jurisdiction under the effects test. *Marten*, 499 F.3d at 298 (quoting *IMO Indus.*, 155 F.3d at 265).

Baez wrote an entry in the TECS system on September 1, 2008 concerning his August 31, 2008 secondary inspection of Francis at the San Juan Airport. (Dkt. No. 168-3 at 5-6). The entry provided that Francis was "disoriented and nervous"; it took him some time to answer a question about his profession; a bag exam was conducted with negative results; Francis would be aboard the M/V AOS until September 7, 2008; and Francis was traveling with Bryan and Beberman. (Dkt. No. 97-6 at 20). While the entry noted that Francis would be traveling on the M/V AOS until September 7, 2008, nothing in the record indicated that Baez "expressly aimed any tortious conduct" at the Virgin Islands, or "deliberate[ly] target[ed]" the Virgin Islands. *Marten*, 499 F.3d at 297, 298. Moreover, his comments in the TECS system could be seen by any agent with access to the system (Dkt. No. 168-3 at 10), not only in the Virgin Islands. *Cf. Ford*, 2010 WL 3927321, at *6 (observing that plaintiff did not indicate whether defendants' allegedly tortious web postings on two websites were accessible worldwide or were exclusively available to people in the Virgin Islands and finding that, as a result, the court did not have enough evidence to find that defendants aimed their tortious activities at the Virgin Islands) (citing *IMO Indus.*, 155 F.3d at 264 ("Given...

19

[the website] was accessible worldwide, there is no basis to conclude that the defendants expressly aimed their allegedly tortious activity at Pennsylvania knowing that harm was likely to be caused there.")). Accordingly, the Court finds that the third prong of the *Calder* effects test is not met, and the Court may not exercise personal jurisdiction over Officer Baez.

The Court comes to a different conclusion, however, with regard to Officer Ogg. He authored "one-day lookouts" on Bryan, Francis, and Beberman that specifically detailed that they would be arriving on the M/V AOS in St. Thomas on September 6, 2008 and in San Juan on September 7, 2008, and requested "100% exam cabins 8330/8332" (Plaintiffs' two cabins) in Bryan's and Beberman's lookouts, and "100% examination" in Francis' lookout. (Dkt. No. 97-6 at 2, 11, 18). Although Defendants cite Ogg's testimony that he placed the TECS lookouts with the intention that the cabin inspections take place in Puerto Rico (Dkt. No. 95 at 12), Ogg's claimed subjective intent is not dispositive. In fact, in his written entries, Ogg advised not only of Plaintiffs' arrival in San Juan on September 7, 2008, but of Plaintiffs' arrival in St. Thomas the day before— on September 6, 2008. The directive for a "100% exam," together with the fact that St. Thomas was the first United States port of call after the cruise ship had been at foreign ports, confirms the reasonableness of the contention that Ogg expressly aimed his conduct at the Virgin Islands. The fact that Ogg also directed his lookouts to the CBP officers in Puerto Rico does not detract from his focus on the Virgin Islands.

In view of the foregoing, the Court concludes that Ogg intentionally and "expressly aimed his tortious conduct at the forum." *IMO Indus.*, 155 F.3d at 266; *see also Patchen v. McGuire*, 2012 WL 4473233, at *5 (E.D. Pa. Sept. 27, 2012) ("The crucial factor is whether a defendant intentionally targeted or interacted with the forum state through his use of the website.") (citing *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 452 (3d Cir. 2003)); *cf. Gorman v. Jacobs*, 597

F. Supp. 2d 541, 548 (E.D. Pa. 2009) ("Thus, for a court to exercise personal jurisdiction based on the use of a web site . . . , *something* about the web site must suggest to the user that residents of the forum state are the target audience[.]"). Further, regarding the first and second prongs of the *Calder* test, the Court finds that Ogg, who inputted information in the TECS system upon which the other CBP officers relied, is responsible for "aiding and abetting" the alleged intentional torts that resulted from the search; the Plaintiffs felt "the brunt of the harm" in the Virgin Islands when their cabins were searched on September 6, 2008 on St. Thomas; and that harm (*i.e.*, the search) was "the focal point of the harm suffered by the plaintiff[s] as a result of that tort." *Marten*, 499 F.3d at 297. Accordingly, the Court finds that the *Calder* test is satisfied, and that the Court has personal jurisdiction over Officer Ogg.

### B.  The *Bivens* Cause of Action

In Count Four of the First Amended Complaint, Plaintiffs allege that CBP Officers Mazur, Demarais, Torres, DeFelice, and Santiago, aided and abetted by Officers Baez and Ogg, violated their Fourth Amendment rights to be free from: (1) unreasonable searches by searching their cabins on September 6th without reasonable suspicion; and (2) unreasonable seizures by detaining them. (Dkt. No. 38, ¶¶ 70, 71).[14] Plaintiffs also claim that these actions violated their Fifth Amendment right to due process, and that they suffered damages. *Id*. ¶¶ 72, 73.

In *Bivens*, the Supreme Court "recognized for the first time an implied private right of action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Argueta v. U.S. ICE*, 643 F.3d 60, 69 (3d Cir. 2011) (internal quotation marks omitted). *Bivens* claims can be maintained against a defendant in his or her individual capacity only. *Lewal*

---

[14] Santiago was subsequently dismissed from the lawsuit pursuant to Fed. R. Civ. P. 41(a)(1). (Dkt. No. 63). As discussed above, Baez has been dismissed by this Court on personal jurisdiction grounds. *See supra* at pp. 19-20.

*v. Ali*, 289 F. App'x 515, 516 (3d Cir. 2008) (citing *Jaffee v. United States,* 592 F.2d 712, 717 (3d

Cir. 1979)). In order to bring a *Bivens* cause of action, a defendant must have acted under color of

federal law, and his or her conduct must have deprived a person of rights, privileges, or immunities

secured by the Constitution or laws of the United States. *Martinez v. Francois,* 2015 WL 1283371,

at *6 (D.V.I. Mar. 17, 2015) (citing *Schreane v. Seana,* 506 F. App'x. 120, 123 (3d Cir. 2012)).

The individual Defendants assert that this lawsuit cannot be maintained against them

because they are entitled to qualified immunity on Plaintiffs' *Bivens* claim.

### 1. Qualified Immunity Standard

Qualified immunity shields federal agents from suit for damages if "a reasonable officer

could have believed [his] warrantless search to be lawful, in light of clearly established law and

the information the . . . officers possessed." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). In

*Ray v. Twp. of Warren*, 626 F.3d 170 (3d Cir. 2010), the Third Circuit summarized the qualified

immunity doctrine:

> The Supreme Court has established a two-part analysis that governs whether a
> government official is entitled to qualified immunity. *Saucier v. Katz,* 533 U.S. 194,
> 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). The first question in the *Saucier*
> analysis asks whether the official's conduct violated a constitutional or federal right.
> *Id.* This is not a question of immunity, but whether there is any wrong to address.
> *Curley v. Klem,* 499 F.3d 199, 207 (3d Cir. 2007). The second question asks
> whether the right at issue was "clearly established." *Saucier,* 533 U.S. at 201, 121
> S. Ct. 2151. To be clearly established, "[t]he contours of the right must be
> sufficiently clear that a reasonable official would understand that what he is doing
> violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034, 97
> L.Ed.2d 523 (1987). If "the officer made a reasonable mistake about the legal
> constraints on his actions," then qualified immunity should protect him from suit.
> *Curley,* 499 F.3d at 207. In considering that question, we judge the officer's actions
> from the perspective of an objectively reasonable law enforcement officer under
> the circumstances, and we endeavor to avoid hindsight. *Graham v. Connor,* 490
> U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

*Id.* at 174. Courts may "exercise their sound discretion in deciding which of the two prongs of the

qualified immunity analysis should be addressed first in light of the circumstances in the particular

case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Qualified immunity affords "protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The "burden of establishing qualified immunity falls to the official claiming it as a defense." *Burns v. Pa. Dep't of Corrs.*, 642 F.3d 163, 176 (3d Cir. 2011). The entitlement provided by qualified immunity "'is an *immunity from suit* rather than a mere defense to liability.'" *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

Defendants assert that they are entitled to qualified immunity because "Plaintiffs have not shown that any clearly established constitutional rights were violated." (Dkt. No. 95 at 19). They claim that because *United States v. Whitted*, 541 F.3d 480 (3d Cir. 2008)—which established a reasonable suspicion standard for passenger ship cabin searches at the border—was issued only two days before the search occurred in St. Thomas, that requirement was not clearly established on the day of the search nor was the new standard apparent to a reasonable CBP Officer. *Id.* at 19-20.[15]

Plaintiffs contend that "Defendants are not immune because the law was clearly established on September 6 and 7, 2008." (Dkt. No. 17 at 19). In this regard, they make two arguments that the *Bivens* count is not barred by qualified immunity. They claim, first, that the search "violated

---

[15] Defendants also argue that the reasonable suspicion requirement articulated in *Whitted* was unnecessary to the outcome of that case and is therefore dicta, citing the concurrence of Judge Michael A. Chagares. (Dkt. No. 95 at 20, citing *Whitted*, 541 F.3d at 491). In his concurrence, Judge Chagares explained, in relevant part: "We all agree that, even assuming the search of James Whitted's cabin was non-routine, reasonable suspicion existed to support the search. I would affirm the District Court's refusal to suppress on this limited basis and thereby avoid the unnecessary resolution of a constitutional issue of first impression." *Whitted*, 541 F.3d at 491. Even if the case could have been decided on a more limited basis, this does not relegate *Whitted's* actual holding that reasonable suspicion is needed for a cabin search at the border to dicta.

the clearly established constitutional interpretation that border searches must be reasonable" and second, that *Whitted* "clearly established the law when it was filed," making the St. Thomas search unconstitutional. (Dkt. No. 17 at 19-26). The Court will address these two arguments in reverse order.

### 2.  Whether the *Whitted* Reasonable Suspicion Standard Was Clearly Established

The constitutional right at issue that must be "clearly established" is that a search of a passenger ship cabin at the border is non-routine and therefore requires reasonable suspicion in order to pass muster under the Fourth Amendment. The second prong of the qualified immunity analysis is whether that right was clearly established, pursuant to *Whitted,* on September 5, 2008, the day that Ogg inputted the lookouts on the TECS system advising "100% exam cabins 8330/8332" in Bryan's and Beberman's entries, and "100% examination recommended" in Francis' entry, which prompted the September 6, 2008 search of Plaintiffs' cabins in St. Thomas. (Dkt. No. 97-6 at 2, 11, 18).[16]

---

[16] The Court considers September 5, 2008 as the significant date on which the constitutional right at issue was required to be "clearly established" for the qualified immunity analysis because that was the day that Ogg inputted the lookouts on Plaintiffs into TECS. Pursuant to *Whitted*, he was the actor who would have been required to have "reasonable suspicion" in order to justify a non-routine cabin search at the border. The ruling in *Whitted* supports the focus on whether Ogg had reasonable suspicion to input the lookouts, given that the officers who effected the search would be able to reasonably rely on those lookouts. The Court in *Whitted* observed that customs officers should be able to rely on data provided by computer reports to create reasonable suspicion for a search. If they cannot, their hands would be tied until they either independently investigated the individual or contacted each source for the report to confirm its validity. Just as a customs officer is entitled to rely on unconfirmed information relayed to him by his supervisor in order to look out for and search an individual at the border, so too is a customs officer permitted to rely on TECS information entered by other customs officials to create reasonable suspicion for a search.

*Whitted*, 541 F.3d at 490 (internal citation omitted). This is in accord with case law in an analogous context which provides that "[w]hen officers are told to investigate a situation by a police dispatcher, . . . the court must look beyond the specific facts known to the officers on the scene to the facts known to the dispatcher." *United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008),

As a preliminary matter, an analysis of this issue raises the threshold question as to whether the single Third Circuit case of first impression upon which Plaintiffs heavily rely—*Whitted*—is sufficient to "clearly establish" a constitutional right for purposes of qualified immunity. This presents a serious, although seemingly unresolved question.

In *Taylor v. Barkes*, 135 S. Ct. 2042 (2015), the Supreme Court assessed whether a certain constitutional right was clearly established. It found no Supreme Court decision that established the right at issue. It then surveyed circuit precedent and found there was no "'robust consensus of cases of persuasive authority'" at the circuit level, and thus the right was not established there either. *Id.* at 2044 (quoting *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. __, 135 S. Ct. 1765, 1779 (2015)). The Court went on to say, "[t]he Third Circuit nonetheless found this right clearly established by two of its own decisions, both stemming from the same case. *Assuming for the sake of argument that a right can be 'clearly established' by circuit precedent despite disagreement in the courts of appeals*, neither of the Third Circuit decisions relied upon established the right at issue." *Id.* at 2045 (emphasis added). The Supreme Court did not, therefore, squarely address whether the Third Circuit's reliance on "two of its own decisions, both stemming from the same case," was a sufficient basis upon which to premise a "clearly established" constitutional right. *Id.*

---

citing, *inter alia, Rogers v. Powell*, 120 F.3d 446, 453 (3d Cir. 1997) ("The legality of a seizure based solely on statements issued by fellow officers depends on whether the officers who *issued* the statements possessed the requisite basis to seize the suspect."). In any event, whether the inputting of the lookouts on September 5 or the searching of the cabins on September 6 is viewed as the significant event for purposes of the "clearly established" analysis, the conclusion remains unchanged because the difference in time is insignificant.

The Third Circuit has relied on *Taylor* in articulating the "clearly established" constitutional right for purposes of qualified immunity. In this regard, the Third Circuit stated that a government official's conduct violates "clearly established" law when

> at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd,* 563 U.S. 731, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). "In other words, there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited." *McLaughlin v. Watson,* 271 F.3d 566, 572 (3d Cir. 2001). We look first for applicable Supreme Court precedent. Even if none exists, it may be possible that a "robust consensus of cases of persuasive authority" in the Court of Appeals could clearly establish a right for purposes of qualified immunity. *Taylor v. Barkes,* __ U.S. __, 135 S. Ct. 2042, 2044, 192 L. Ed. 2d 78 (2015) (per curiam) (quoting *City & Cnty. of S.F. v. Sheehan,* __ U.S. __, 135 S. Ct. 1765, 1778, 191 L. Ed. 2d 856 (2015)).

*Mammaro v. N.J. Div. of Child Protection & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016).[17] In *Mammaro*, the Third Circuit concluded that "there was no consensus of authority that temporarily removing a child after the parent takes the child from approved housing violates substantive due process." *Id.* at 170. It found no Supreme Court case on point. *Id.* Then, even "assuming a consensus of persuasive authority could clearly establish a [substantive due process] right," the Third Circuit opined that "there is no consensus that removing [the child] was an unconstitutional interference with the parent-child relationship," and found plaintiff's citation to another Third

---

[17] Plaintiffs rely on *Gallo v. City of Phila.*, 161 F.3d 217 220 n.4 (3d Cir. 1998) for the proposition that "a decision of the Third Circuit Court of Appeals clearly establishes the law within the Third Circuit." (Dkt. No. 17 at 24). In a footnote, *Gallo* cited *Pro v. Donatucci*, 81 F.3d 1283, 1291-92 (3d Cir. 1996), which "*assum[ed]* that decisions of this court can clearly establish a right for qualified immunity purposes" (emphasis added) and *Medina v. City & Cnty. of Denver*, 960 F.2d 1493, 1948 (10th Cir. 1992), which opined that, "in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point." In view of *Taylor* and *Mammaro,* the *Gallo* decision does not resolve the question.

Circuit case was factually off point and did not put caseworkers on notice that their conduct violated substantive due process. *Id*. at 170-71.

The importance of the question as to what constitutes a "robust consensus of cases of persuasive authority in the Court of Appeals," *id.* at 169, is highlighted by the facts and circumstances of this case. Here, Ogg entered the TECS lookouts while working in Puerto Rico— located in the First Circuit. Because, as noted above, Ogg's actions were the impetus for the search that took place on St. Thomas, Virgin Islands—in the Third Circuit—his actions and the bases therefor are critical. Thus, if a case of first impression, with decades-old law to the contrary, is to be deemed to constitute "clearly established" law for constitutional purposes, its far-reaching impact into other circuits—with law to the contrary, as here—must be considered.[18] It would seem anomalous to conclude that a single circuit case constitutes the kind of "'robust consensus' of cases of persuasive authority in the Court of Appeals," *id.*, to have such an impact. This Court concludes that it does not.

---

[18] Plaintiffs cite *United States v. Andujar-Aponte*, 2010 U.S. Dist. LEXIS 11438 at *34-38 (D.P.R. Feb. 10, 2010) as indicating that "CBP Officers in Puerto Rico must have a reasonable suspicion to search a cruise ship cabin." (Dkt. No. 104 at 11). However, *Andujar-Aponte* was decided approximately a year and a half after the search in this case and is a district court decision, which does not "clearly establish" the law in the First Circuit. *Whitted* itself cited a First Circuit case, *United States v. Cardona-Sandoval*, 6 F.3d 15, 21-23 (1st Cir. 1993), in a footnote, 541 F.3d at 487 n.8, observing that courts that have considered searches at sea have "uniformly recognized a greater expectation of privacy in private dwelling areas of a ship than that in public areas," and differentiating between areas where "little or no privacy can be expected and an individual's living and sleeping quarters." *Id.* at 487. *Cardona*, however, concerned the interception of a small fishing vessel by the U.S. Coast Guard in U.S. waters off Puerto Rico while performing a drug interdiction. The key difference between *Cardona* and *Whitted* is the fact that the search in *Whitted* was a *border* search, where case law had long held that routine searches aboard ships (including passenger cabins) did not require reasonable suspicion. Other courts—including the First Circuit in *Cardona*—had not previously held that a border search of a passenger cabin was non-routine requiring reasonable suspicion. Accordingly, *Cardona* did not "clearly establish" the *Whitted* rule in the First Circuit.

Even assuming that a single case of first impression in the Third Circuit can "clearly establish" a constitutional standard for purposes of qualified immunity, the Court finds that the reasonable suspicion standard for cabin searches at the border or its "functional equivalent," propounded in *Whitted*,[19] was not clearly established on either the date that Ogg inputted the lookouts or on the date of the St. Thomas search. *See Pearson,* 555 U.S. at 243-44 ("[W]e hold that petitioners are entitled to qualified immunity because the entry did not violate clearly established law. An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment.").

"Because the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness [in this context] is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *see also George v. Rehiel*, 738 F.3d 562, 572 (3d Cir. 2013) ("Determining whether a right alleged to have been violated is so clearly established that any reasonable officer would have known of it 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'") (quoting *Brosseau*, 543 U.S. at 198). "On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred." *Harlow*, 457 U.S. at 818.

---

[19] In *Whitted*, the Third Circuit explained that searches "conducted at the nation's borders . . . represent a well-established and long-standing exception to the warrant requirement. The exception applies not only at the physical boundaries of the United States, but also at the 'functional equivalent' of a border, including the first port where a ship docks after arriving from a foreign country. The search here, conducted as the Adventure of the Seas arrived in St. Thomas from St. Maarten, was therefore a border search." *Whitted*, 541 F.3d at 484-85 (internal citations omitted).

At the center of the Court's analysis is the Third Circuit's opinion in *Whitted*, which was issued on September 4, 2008. In that case, the Court stated that it was required to "answer a question of first impression: whether the Fourth Amendment requires any level of suspicion to justify a border search of a passenger cabin aboard a cruise liner arriving in the United States from a foreign port." *Whitted*, 541 F.3d at 482. In addressing the issue, the Court in *Whitted* reviewed the history of border searches, and the case law which divided such searches into routine searches, which could be conducted "not just without a warrant, but without probable cause, reasonable suspicion, or any suspicion of wrongdoing," and non-routine searches, which "require[d] reasonable suspicion of wrongdoing to pass constitutional muster." *Id.* at 485 (citing *United States v. Montoya de Hernandez*, 473 U.S. 531, 538, 541 (1985)). Prior to *Whitted,* searches of private sleeping cabins aboard a cruise ship were considered routine, and could be performed without any suspicion. *Id*. at 485-86. Acknowledging that "[n]either [the Third Circuit] nor the Supreme Court ha[d] addressed the issue of whether the search of a cabin of a cruise ship sufficiently intrudes upon an individual's privacy to render it non-routine, so that reasonable suspicion of criminal activity is required," and recognizing the "surprising dearth of authority on the matter," *id.* at 486, the Court in *Whitted* proceeded to address whether "any Fourth Amendment protection applies to a search of a private sleeping cabin aboard a cruise ship." *Id*. at 485. The *Whitted* opinion broke new legal ground by holding that a cabin search at an international border (or its functional equivalent) was non-routine, and therefore reasonable suspicion was needed to support that search. *Id*. at 488-89.

The question here is whether the one-day time period between the September 4, 2008 issuance of *Whitted* and Ogg's inputting of the lookouts on September 5, 2008—upon which the officers properly relied in conducting the search on September 6, 2008—provides the requisite

"fair notice" such that the right was "clearly established" and the individual officers could be held accountable. *Brosseau,* 543 U.S. at 198. There was certainly no Supreme Court precedent on point, nor was there a "robust consensus of cases of persuasive authority" in the Court of Appeals that clearly established that right. *Taylor*, 135 S. Ct. at 2044.

Plaintiffs argue that, once the *Whitted* opinion issued, it was "clearly established that the St. Thomas search was unconstitutional" (Dkt. No. 17 at 21); the CBP officers "should have known that they needed to have a reasonable suspicion to search Plaintiffs' cabins"; the CBP officers are "charged with constructive knowledge of established law"; and that the Department of Homeland Security "had the duty to notify its agents and would have directed its CBP officers to desist from conducting unconstitutional searches as soon as the *Whitted* decision issued." *Id.* at 26. However, Plaintiffs' suppositions about what the CBP officers purportedly should have known about the change in the law wrought by *Whitted,* in the context of whether that change was clearly established for qualified immunity purposes, is not supported by case law that has addressed the time frame for determining when a right is "clearly established."

In *Lintz v. Skipski*, 25 F.3d 304 (6th Cir. 1994), the Sixth Circuit analyzed when a substantive right became "clearly established" in a 42 U.S.C. § 1983 case for purposes of qualified immunity. The court in *Lintz* surveyed cases where a circuit court decision changing established standards had been issued prior to the defendant's actions, and advocated that courts apply "a rule of reason in each case with respect to compliance with new decisions" where "the question is one of fairness in light of all the facts." *Id.* at 306. It found four months a sufficient period of time for defendants to have learned of the new decision and to have adjusted their conduct accordingly. *Id.*

In reaching that conclusion, *Lintz* collected cases which examined various time frames where courts ruled that state officials had sufficient time to become aware of circuit court or

Supreme Court decisions in order to meet the "clearly established" prong of the qualified immunity analysis. *Id.*, citing *Garcia v. Miera,* 817 F.2d 650, 657 n.10 (10th Cir. 1987) (five months sufficient time to be aware of Tenth Circuit decision); *Schlothauer v. Robinson,* 757 F.2d 196, 197-98 (8th Cir. 1985) (officers immune from liability despite on-point Eighth Circuit decision decided eleven days prior to defendant's actions and no Supreme Court case then on point); *Schiff v. Williams*, 519 F.2d 257, 263 (5th Cir. 1975) (Gee, J., specially concurring) (arguing that law was sufficiently established by Fifth Circuit opinion that had been decided two months prior to defendant's actions).[20]

As indicated above, qualified immunity case law explores whether an officer had "*fair notice* that [his] conduct was unlawful," *Brosseau,* 543 U.S. at 198 (emphasis added), and whether the official's actions violated "clearly established statutory or constitutional rights of which a *reasonable person would have known*." *Harlow*, 457 U.S. at 818 (emphasis added); *Pearson*, 555 U.S. at 244 ("The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law."). The Court does not

---

[20] One of the cases cited by Plaintiffs on the question of when a right becomes clearly established— *Muzychka v. Tyler*, 563 F. Supp. 1061, 1065 (E.D. Pa. 1983)—provided that an on-point Supreme Court decision issued *three weeks* before a search clearly established relevant law. (Dkt. No. 17 at 25). Another case they cite, *Smith v. Montgomery Cnty.*, 573 F. Supp. 604 (D. Md. 1983), found that a Fourth Circuit case, *Logan v. Shealy*, 660 F.2d 1007 (4th Cir. 1981), decided on October 7, 1981, was "controlling on the merits" of the *Smith* case as of the date *Logan* was decided. *Smith*, 573 F. Supp. at 610. However, the actions at issue in *Smith* took place on November 12, 1981, over a month after *Logan* had established the new constitutional standard in the Fourth Circuit. Thus, given the length of time after the decision in *Logan*, there was no challenge as to whether *Logan* had "clearly established" the law by the time the actions (a month later) at issue in *Smith* had occurred. That case, therefore, does not assist Plaintiffs in their effort to show that *Whitted* "clearly established" the Fourth Amendment protection at issue on the date it was decided so as to render Defendants liable for conduct in which they engaged one or two days after the opinion was issued. In any event, if Plaintiffs' interpretation of *Smith* is correct, this Court would reject the application of such a conclusion in this case as inconsistent with a rule of reason and the notion that "fair notice" is required.

consider one day as constituting fair notice so as to bring a completely new legal standard for conducting searches within the realm of "clearly established" law of which a "reasonable person would have known."[21] *Id.* The same reasoning obtains for the officers who carried out the search less than two days after the *Whitted* decision issued.[22]

       Finally, Plaintiffs state, without argument, that

> even though the question of whether a passenger's cruise ship cabin may be searched at a border without reasonable suspicion was one of first impression, Plaintiffs' right to be free from such a search was clearly established. *See Gruenke v. Seip*, 225 F.3d 290, 300 (3d Cir. 2000) (holding that even though question of whether school official could administer pregnancy test was one of first impression, student's right to be free from such search was clearly established).

(Dkt. No. 17 at 24).

       *Gruenke* does not assist Plaintiffs. In *Gruenke*, a high school student was allegedly required by her swim team coach to take a pregnancy test in circumstances where the results were not private. The district court ruled that the law was not clearly established that requiring a pregnancy test violated the Fourth Amendment. The Third Circuit held that simply because the Supreme Court had not ruled on whether a school official's administration of a pregnancy test violated a student's Fourth Amendment rights did not mean the right was not clearly established. The court

---

[21] Plaintiffs' argument that DHS "would have directed its CBP officers to desist from conducting unconstitutional searches as soon as the *Whitted* decision issued" is pure speculation, unsupported by any factual underpinning that might give substance to their assertions that Ogg should have known about the changed standard one day after the opinion was issued. (Dkt. No. 17 at 26).

[22] Plaintiffs also assert that the CBP officers "had at least constructive knowledge of the holding in *Whitted*." (Dkt. No. 17 at 25). They base this unsupported conclusion on the general statement in *Salahuddin v. Coughlin*, 781 F.2d 24, 27 (2d Cir. 1986) that "[o]fficials are held to have constructive knowledge of established law." But whether the law was in fact "established" is precisely the question here. Indeed, the issue of whether public officials are held to have constructive knowledge of the law is "simply whether the law was clearly established." *Sorensen v. City of New York*, 42 F. App'x 507, 510 (2d Cir. 2002) (citing *Salahuddin*, 781 F.2d at 27). The Court has found here that it was not.

reviewed "current Fourth Amendment law in the public school context" including *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995), where the Supreme Court upheld random urinalysis testing of student athletes in a manner that provided certain privacy protections. *Gruenke,* 225 F.3d at 300-01. The Court in *Gruenke* opined that the *Vernonia* standard "clearly establishes that a school official's alleged administration to a student athlete of the pregnancy tests would constitute an unreasonable search under the Fourth Amendment . . . absent a legitimate health concern about a possible pregnancy and the exercise of some discretion." *Id.* at 301. The *Gruenke* Court extrapolated the *Vernonia* standard and applied it to its facts to find that the kind of invasive search in *Gruenke*, without appropriate privacy protections, violated clearly established law. *Id.* at 302; *see al-Kidd,* 563 U.S. at 741 (observing that for determining whether a right is clearly established, "[w]e do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."); *McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001) ("[T]here must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited.").

Here, however, there was no previously existing standard concerning border searches of private areas on passenger ships that would make *Whitted* a mere extrapolation of that law. Nor was there case law that was factually similar to Plaintiffs' allegations that would have put CBP officers on notice that reasonable suspicion was required to search Plaintiffs' cabins. In fact, the standard prior to *Whitted* was the complete opposite of the standard post-*Whitted,* as Plaintiffs themselves acknowledge. Contrary to Plaintiffs' contention, *Gruenke* does not stand for the proposition that Plaintiffs' right to be free from a border cabin search without reasonable suspicion was established—let alone clearly established—prior to *Whitted*.

Accordingly, even assuming that a single circuit opinion can clearly establish a constitutional standard, the Court finds, as a matter of law, that one day between the issuance of *Whitted*—which required reasonable suspicion for a passenger ship cabin border search, and which significantly changed the longstanding modus operandi that required no level of suspicion for such a search—and Ogg's decision memorialized on the TECS system directing border agents to conduct such a search, does not provide "fair notice" to a "reasonable officer" of that new standard and of the conduct that, literally overnight, suddenly became unconstitutional. Under the circumstances here, the new constitutional right was barely established, and certainly not *clearly* established, at the time that Ogg acted and the subsequent search took place.

Completely independent of the Court's reasoning and conclusion above is the question of the finality of the *Whitted* opinion on the date of issuance, which provides a separate basis for concluding that the reasonable suspicion standard was not "clearly established" law at the time of the events giving rise to this lawsuit. Four days after the Third Circuit rendered the *Whitted* Opinion and Judgment, Whitted filed a Motion for an Enlargement of Page Limitation for Petition for Rehearing. *United States v. Whitted*, No. 06-3271 (3d Cir. Sept. 4, 2008). Shortly thereafter, the United States filed a Motion for a sixty-day Extension of Time within which to File its Petition for Rehearing, noting that the part of the *Whitted* Opinion addressing whether reasonable suspicion was required to search a cruise ship cabin at the border "may have significant impact upon the border enforcement and national security operations of U.S. Customs and Border Protection (CBP)," and therefore an extension of time was needed to determine whether to seek a panel rehearing or rehearing en banc. *United States v. Whitted*, No. 06-3271 (3d Cir. Sept. 16, 2008). The Court granted both Motions on December 1, 2008, the same day that both Whitted and the United States filed their petitions for rehearing before the original panel. Whitted challenged the

34

Third Circuit's holding that customs officers could obtain reasonable suspicion solely from a TECS report, and the United States challenged the holding that reasonable suspicion was required before officers could enter a ship's cabin in the context of a border search. The parties thus challenged critical holdings in the *Whitted* case, which have equally critical implications here. The Third Circuit summarily denied the petitions for rehearing on March 16, 2009 and issued the mandate on March 25, 2009, more than six months after the *Whitted* Opinion had issued.

Third Circuit case law, as well as case law in other circuits, provides that "[a]n appellate court's decision is not final until its mandate issues." *Mary Ann Pensiero, Inc. v. Lingle,* 847 F.2d 90, 97 (3d Cir. 1988) (citing *Finberg v. Sullivan,* 658 F.2d 93, 99 (3d Cir. 1981) (en banc)); *see also Holland v. Florida*, 560 U.S. 631, 638 (2010) (observing that when Eleventh Circuit issued its mandate, that made its decision final). As explained by the Eleventh Circuit in *Flagship Marine Servs., Inc.  v. Belcher Towing Co.*, 23 F.3d 341, 342 (11th Cir. 1994), "[u]ntil the mandate issues, an appellate judgment is not final; the decision reached in the opinion may be revised by the panel, or reconsidered by the en banc court, or *certiorari* may be granted by the Supreme Court"; *see also Nat. Res. Defense Council, Inc. v. Cnty. of Los Angeles,* 725 F.3d 1194, 1203 (9th Cir. 2013) (opining that "'[n]o opinion of this circuit becomes final until the mandate issues,'" quoting *Carver v. Lehman*, 558 F.3d 869, 878 (9th Cir. 2009), and citing Fed. R. App. P. 41(c), 1998 Adv. Comm. Note ("A court of appeals' judgment or order is not final until issuance of the mandate"), and noting that a court of appeals may "'modify or revoke its judgment at any time prior to issuance of the mandate, sua sponte or by motion of the parties.'") (quoting *United States v. Foumai,* 910 F.2d 617, 620 (9th Cir. 1990)); *Hill v. Mississippi*, 459 F. App'x 365, 365 (5th Cir. 2012) ("Because the mandate had not issued for our . . . opinion, that opinion was not final[.]").

35

The facts here are undeniable: the issue regarding the need for reasonable suspicion for cabin border searches was one of first impression; the conclusion in *Whitted* changed a longstanding rule to the contrary; the United States advised the Third Circuit of the "significant impact" that the ruling may have on border enforcement and national security operations, and requested a sixty-day extension of time to determine whether to seek further review of the Court's opinion; the Third Circuit granted the United States' motion for an extension of time; Whitted and the United States sought rehearing; the petitions for rehearing were denied;[23] and the mandate issued over six months after the original opinion. Under these circumstances, and in view of the well-established law in the Third Circuit—as in other circuits—that an appellate decision is not final until the mandate issues, this Court cannot conclude that the new "reasonable suspicion" standard was "clearly established" as of the date the *Whitted* Opinion was issued.

For each of the independent reasons discussed above, the Court finds that qualified immunity shields the individual CBP officers from liability on the *Bivens* claim because the *Whitted* standard was not clearly established at the time that the events underlying this lawsuit transpired.[24]

---

[23] Although the parties' petitions for rehearing were summarily denied, during the time that the petitions were pending before the Third Circuit, there was uncertainty as to what the final disposition would be, which was not determined until the mandate issued.

[24] In their Opposition to the Motion for Summary Judgment, Plaintiffs argue extensively that "whether CBP Officers had reasonable suspicion that Plaintiffs were involved in criminal activity is a disputed question of fact." (Dkt. No. 104 at 3-8). Plaintiffs' position assumes that reasonable suspicion is the standard against which the CBP officers' actions must be evaluated. The Court, however, has found that the reasonable suspicion standard was not clearly established, thereby rejecting the premise for Plaintiffs' argument. In any event, the Court finds below that, even if the reasonable suspicion standard had been clearly established, Ogg satisfied it, and no genuine issue of material fact was raised to preclude summary judgment on the issue.

### 3.  Reasonable Suspicion

Even if the Court were to conclude that the *Whitted* reasonable suspicion standard was clearly established law at the time of the events in question, this would not alter the Court's conclusion that there was no constitutional violation. This is because Ogg had a "particularized and objective basis to suspect illegal activity in order to conduct a search," thereby satisfying the reasonable suspicion standard. *United States v. William,* 360 F. App'x 320, 322 (3d Cir. 2010) (quoting *Whitted*, 541 F.3d at 489).

> Under the reasonable suspicion standard,
>
> [t]he officers must be able to articulate reasons that led to the search . . . that are indicative of behavior in which most innocent people do not engage. We consider the totality of the circumstances in determining whether reasonable suspicion existed at the time of the search. Accordingly, although each individual factor alone may be consistent with innocent behavior, it is sufficient if together they serve to eliminate a substantial portion of innocent travelers.

*Id.* (quoting *Whitted*, 541 F.3d at 489) (internal quotation marks and citations omitted). "'The principal components of a determination of reasonable suspicion. . . will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion.'" *United States v. Mathurin,* 561 F.3d 170, 174 (3d Cir. 2009) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Only a "minimal level of objective justification" is necessary. *Id.*

Generally, "[a] search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond,* 531 U.S. 32, 37 (2000); *see also United States v. Cortez*, 449 U.S. 411, 418 (1981) ("[A]n assessment of the whole picture . . . must raise

a suspicion that the particular individual being stopped is engaged in wrongdoing."). The reasonableness of a search depends, first, on "whether the . . . action was justified at its inception," *Terry v. Ohio*, 392 U.S. 1, 20 (1968) and, second, on whether the search actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.; see also New Jersey v. T.L.O.,* 469 U.S. 325, 341 (1985).

The reasonable suspicion analysis focuses on Ogg, who posted TECS lookouts on Bryan, Francis, and Beberman which, in turn, led to the search of their cabins. To recap, Ogg testified that he reviewed a TECS report on Bryan dated April 30, 2000, written by Officer Hodge, an ICE agent, which stated: "Subject is associates [sic] with suspected drug smugglers within the US Virgin Islands. Subject is also suspected of smuggling narcotics within the Virgin Islands.  If encountered, conduct 100% exam . . . ." (Dkt. No. 97-6 at 4; Dkt. No. 167-3 at 14). Because Ogg knew Officer Hodge and regarded him as an "excellent worker," he wanted to take a closer look. (Dkt. No. 170-1 at 8). Ogg testified that he also considered a TECS entry from June 2, 2004, which referred to the 2000 St. Thomas TECS record, and stated that Bryan was a "suspect in USVI drug smuggling," and asked agents reading the report to "[p]lease document co-travelers, employment & reason for trave[l]."  (Dkt. No. 108-18 at 67; Dkt. No. 167-6, ¶ 25).

Ogg testified that the 2006 TECS records concerning Francis indicated that he was the "Subject of DEA indictment" and asked that, "if encountered," a particular special agent be contacted. (Dkt. No. 97-6 at 22). Ogg considered the fact that Bryan and Francis were traveling together, even though their TECS records were not linked. He found it significant that "[w]hen I got two different agencies [ICE and DEA] with two different cases, one is not as old as the other one, that's, for me, is a clear lookout. I want to see what's going on," particularly where the two passengers had "narcotics records" on TECS. (Dkt. No. 170-1 at 8, 25-26). While Bryan's 2000

38

TECS record, by itself, was eight years old, the balance tipped in favor of further inspection when Ogg considered Bryan and Francis together.[25] Ogg "relied specifically on the records that are in the system" with regard to Bryan and Francis in placing the lookouts. *Id.* at 16; *see Whitted*, 541 F.3d at 490 (opining that a customs officer's reliance on pre-existing TECS records is permissible in a reasonable suspicion analysis).

Ogg stated that he created a TECS lookout on Beberman because she was traveling with Bryan and Francis, both of whom had prior TECS records of interest. There were no pre-existing TECS records on Beberman that would have otherwise alerted Ogg that she, in her own right, should be subject to a "100% examination." Ogg's concern was that, if there was no cabin inspection, Beberman could include Bryan and Francis on her declaration, without having to put their names on it, and they could then go through the border without inspection. (Dkt. No. 170-1 at 23).[26] In other words, because Beberman, Bryan and Francis were traveling together, he did not want Bryan and Francis—who had TECS records—to evade inspection by using Beberman—who had no TECS record—as a cover for them. Moreover, it was reasonable for Ogg to deduce that she had significant connections with Bryan and Francis who, in turn, had TECS records.[27] Those salient facts, considered under the totality of the circumstances, gave Ogg reasonable suspicion. That Bryan and Francis had TECS records, and Beberman was traveling with two people who had

---

[25] In addition to Bryan's eight year-old TECS record, he had a more recent four year-old TECS record and Francis had a two year-old TECS record.

[26] *See* n. 6, *supra*.

[27] On a practical level, even if Ogg had entered no TECS record on Beberman, "her cabin" would have been subject to search because she was traveling with Bryan and shared his cabin. Ogg's testimony makes it clear that he was particularly focused on Bryan and Francis, given their past drug-related TECS records. Once Ogg made a decision to search Bryan's cabin, there would have been no realistic option of separating her belongings from Bryan's during the search, or allowing her to remain in the cabin while Bryan left.

TECS records, "eliminat[ed] a substantial portion of innocent travelers" who were traveling on the M/V AOS—as indicated by the fact that Bryan, Beberman, and Francis' two cabins were the only ones searched that day on a ship that contained over 3000 passengers. *Mathurin,* 561 F.3d at 174 (quoting *Karnes v. Skrutski*, 62 F.3d 485, 493 (3d Cir. 1995)).

Ogg also factored in that the ship was traveling to well-known drug source countries as contributing to his decision to post the lookouts. (Dkt. No. 170-1 at 24). In *Whitted,* the Third Circuit considered that the M/V AOS "traveled to drug source countries" which raised suspicion that Whitted was involved in drug smuggling. *Whitted*, 541 F.3d at 490; *see also United States v. Aleman-Figuereo*, 117 F. App'x 208, 209 (3d Cir. 2004) ("The cruise itinerary included stops in... several foreign locations, including Aruba, Curacao, and St. Maarten, all three of which are known drug source countries.").

In assessing the above facts, the Court concludes that Ogg articulated at least a "minimal, objective justification" for the investigation, *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003), where he "dr[e]w on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that 'might well elude an untrained person,'" *United States v. Chatterpaul*, 200 F. Appx. 147, 150 (3d Cir. 2006) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)); *see also Whitted*, 541 F.3d at 489 ("Reasonable suspicion is not a high standard that will prevent customs officers from detecting drug smugglers at our borders. Rather, it sets a relatively low threshold that will continue to permit the kind of cabin searches customs officers currently conduct."); *see id.* at 491 ("By drawing on his particular expertise, [Ogg] evaluated the information [in the TECS database] and drew inferences that created reasonable suspicion of drug smuggling.").

Accordingly, the Court finds that, under the circumstances here, there was reasonable suspicion to input the TECS lookouts which led to the search of Plaintiffs' two cabins. As a result, even when assessed against the reasonable suspicion standard, the Court finds that there was no constitutional violation.

Plaintiffs offer a number of arguments to support their position that Ogg did not have the requisite reasonable suspicion to input the lookouts. None of them persuade the Court to so conclude.

Plaintiffs first assert that Ogg's testimony concerning the 2000 TECS entry "cannot be credited" because the United States, during discovery,

> produced the TECS records that Officer Ogg had viewed before marking Plaintiffs' cabins for 100% examination. Officer Ogg never viewed the 2000 TECS record, but relied only on the 2004 TECS record and its reference to the 2000 investigation. The 2004 TECS record did not indicate the investigating agency or the investigating officer's name.

(Dkt. No. 104 at 6). Plaintiffs' argument is based on the fact that, during discovery, they asked the United States to produce the TECS entries that Ogg had viewed before marking Plaintiffs' cabin for inspection, and the 2000 TECS entry was not included. (Dkt. No. 167-6, ¶ 31).[28] Plaintiffs' challenge to Ogg's credibility—which cannot be assessed on summary judgment, *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993)—suggests that there may be a genuine issue of material fact that would preclude the entry of summary judgment.

---

[28] The United States has stated that the TECS screenshots were not represented or intended to be an exhaustive listing of all records accessed by Ogg. *See* Dkt. No. 111 at 6; Dkt. No. 167-6, ¶ 31. However, as discussed below, the Court need not—and cannot in the context of summary judgment—resolve this factual issue. *Petruzzi's IGA Supermarkets, Inc*, 998 F.2d at 1230.

However, this factual issue is rendered immaterial by other undisputed facts, and therefore the resolution of that issue is not necessary for the adjudication of the summary judgment motion. In this regard, even assuming that Ogg did not see the 2000 TECS record on Bryan, it is undisputed that Ogg viewed a TECS lookout on him from 2004. The 2004 TECS record specifically referred to the 2000 TECS record—indicating "2000 STT TECS Rec. as suspect in USVI drug smuggling. Please document co-travelers, employment & reason for travel"—which Ogg saw in the 2004 record prior to inputting his September 5, 2008 lookout on Bryan. (Dkt. No. 108-18 at 67). Thus, even if the lack of a screenshot raised a question as to whether Ogg saw the 2000 record, that question would not rise to a genuine issue of material fact since it is undisputed that Ogg viewed the information that Bryan was a "suspect in USVI drug smuggling" from the 2004 record. *See N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue,* 665 F.3d 464, 475 (3d Cir. 2011) ("To be material, a fact must have the potential to alter the outcome of the case."). Accordingly, the Court finds that whether Ogg saw the 2000 TECS record does not impact the reasonable suspicion analysis.

Plaintiffs also argue that "there is uncontroverted evidence that the search was retaliatory," citing *Gasho v. United States*, 39 F.3d 1420, 1438 (9th Cir. 1994), which holds that probable cause is lacking when an arrest is motivated by a desire to retaliate. (Dkt. No. 104 at 3). They hypothesize that the impetus for Ogg inputting the TECS lookouts stemmed from the shaving powder incident at the San Juan Airport when Officer Baez ignored Francis' warning to be cautious in opening his shaving cannister, after which the powder sprayed out, covering the CBP officers, and causing them to cough and sneeze—a situation the Plaintiffs found funny but the CBP officers did not. *Id.* at 4. Plaintiffs theorize that because Baez's and Ogg's desks were next to each other at their office, Baez and Ogg "would have discussed" the shaving powder incident and the individuals involved and, therefore, "[o]n Officer Baez's behalf, Officer Ogg looked for some justification for searching

Plaintiffs' cabins. When he could not find what he considered sufficient reasons for a search, he made things up." *Id.* at 5.

Plaintiffs' retaliation theory is based on sheer speculation without any factual support. Not only is Plaintiffs' argument notable for its lack of any citation to the record in support of the proposition that Ogg inputted the TECS records to retaliate against them for laughing at Baez during the shaving powder incident, but their attenuated line of inference and speculation does not create a genuine issue of material fact so as to defeat summary judgment. *See Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) ("[A]n inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment. Inferences must flow directly from admissible evidence.") (internal quotation marks omitted). Plaintiffs' argument in this regard is thus unavailing.

Plaintiffs also question the way Ogg reached his decision to input the lookouts, claiming that he could have "contacted the investigating officer" referenced in the 2000 TECS lookout on Bryan "to assess whether, after eight years, there was still concern that Bryan might be involved in criminal activity, but deliberately did not"[29]; and if he had conducted a "more thorough investigation, he would have noted that all three Plaintiffs had been submitted to secondary inspections in the past, and none of the secondary inspections had rendered positive results." (Dkt. No. 104 at 6, 7).[30] These critiques of Ogg's investigatory modus operandi—particularly given that

---

[29] Plaintiffs make this argument notwithstanding their contention that Ogg did not see the 2000 TECS record on Bryan.

[30] It very well may have been the case that if Ogg had conducted a "more thorough investigation, he would have noted that all three Plaintiffs had been submitted to secondary inspections in the past, and none of the secondary inspections had rendered positive results." (Dkt. No. 104 at 7). It would also be equally likely that he would have learned that Francis had actually been convicted of the federal drug felony for which he had been indicted in 2006 and that, at the time of the cruise, he was on supervised release. *See* Dkt. No. 168-1 at 34-37. The fact is, however, that none of this

Plaintiffs do not show such procedures are required of CBP officers prior to inputting lookouts, and the Court's finding that the decision of who to search and how are discretionary functions of CBP officers, which even includes negligent exercises of their discretion, *see infra* at 57, n.38; *see, e.g., Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 539 (1988)—simply do not impact the reasonable suspicion analysis. *See Pooler v. United States*, 787 F.2d 868, 871 (3d Cir. 1986), *abrogated on other grounds by Millbrook v. United States*, 133 S. Ct. 1441 (2013) ("Congress did not intend to provide for judicial review of the quality of investigative efforts."). Moreover, Plaintiffs' characterization that Ogg "deliberately" did not contact the investigating officer who entered the 2000 TECS report—or that he "maliciously" entered a false comment about Beberman, Dkt. No. 104 at 6—finds no support in the record and is unabashed argument, not fact. These arguments do not, therefore, advance Plaintiffs' cause.

In sum, even assuming that the *Whitted* reasonable suspicion standard applied here, the Court finds that Defendants established that reasonable suspicion existed to input the lookouts in TECS which led to the search. Accordingly, there was no Fourth Amendment violation.

### 4.   Whether The Search Was Conducted in a Reasonable Manner

Plaintiffs also assert that clearly established case law provides that border stops and searches must be reasonable, and the CBP officers had clear warning that "the highly invasive manner in which they conducted the border search and detention was unreasonable, non-routine, and therefore, unconstitutional absent a reasonable suspicion that Plaintiffs were engaged in criminal activity." *Id.* at 10; *see also* Dkt. No. 17 at 19-21). While this argument echoes the reasonable suspicion argument that the Court has rejected above—given its reference to the

---

additional information was discovered or relied upon by Ogg in deciding to enter the lookouts, and is thus of no consequence to this Court's analysis.

invasiveness and non-routine nature of the search conducted—the Court will analyze it separately, focusing on the reasonableness of the search and whether a constitutional right was violated in that regard.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "The fundamental task of any Fourth Amendment analysis is assessing the reasonableness of the government search." *United States v. Sczubelek*, 402 F.3d 175, 182 (3d Cir. 2005). Courts examine the totality of the circumstances in order to determine whether a search or seizure is reasonable under the Fourth Amendment, *Samson v. California*, 547 U.S. 843, 848 (2006), which involves balancing '"on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other hand, the degree to which [the search] is needed for the promotion of legitimate governmental interests."' *United States v. Knights*, 534 U.S. 112, 119 (2001) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). The standard "is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Courts consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* The Fourth Amendment "does not denounce all searches and seizures, but only such as are unreasonable." *Carroll v. United States*, 267 U.S. 132, 147 (1925). The test of reasonableness under the Fourth Amendment is an objective one. *Los Angeles Cnty., Cal. v. Rettele*, 550 U.S. 609, 614 (2007).

Plaintiffs complain that the September 6, 2008 search of their cabins was unreasonable because the officers banged on and opened the cabin doors, shouted and used harsh tones of voice, gained entry by deceit (telling them that their cabins were chosen randomly), did not allow them to dress in private, and caused them to stand against the wall in the hallway while agents and a dog

searched the cabins and "strew[ed] around the passenger's belongings."[31] (Dkt. No. 17 at 20). In Plaintiffs' view, these acts forced them to "sacrifice their dignity and privacy." (Dkt. No. 104 at 10).

Importantly, the search here focused on the Plaintiffs' *cabins*, not the Plaintiff's persons. While the CBP officers' immediate opening of the cabin doors after they knocked, and the ordering of the disrobed Plaintiffs to get dressed and to stand in the hall was intrusive, the entire incident lasted no longer than ten minutes, if that—only so long as it took for Plaintiffs to get dressed, stand in the hall, and wait for the officer and dog to search both cabins. Plaintiffs themselves were not touched.[32]

---

[31] Plaintiffs also refer to Ogg's statement in the TECS report directing a "100% examination" which "would include body cavity searches" (Dkt. No. 104 at 8), as apparently another factor in their unreasonableness argument. However, no body cavity search was ever conducted, and there cannot be a constitutional violation based on behavior that never took place.

[32] While the officers did not observe Bryan and Beberman getting dressed, they did observe Francis— who was naked when the door opened—getting dressed. In *Ware v. Riley*, 25 F. Supp. 3d 493 (D. Del. 2014), *aff'd* 587 F. App'x 705 (3d Cir. 2014), the court described case law applicable to similar kinds of situations:

> The reasonableness of a seizure or a search receives special scrutiny when a suspect's constitutional right to bodily privacy is implicated. *See, e.g., Whren v. United States,* 517 U.S. 806, 818, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996) (explaining that while probable cause generally renders searches and seizures reasonable, special balancing analysis is needed when seizure or search is "conducted in an extraordinary manner, unusually harmful to an individual's privacy or ... physical interests"). A detention "may be unreasonable if it is unnecessarily painful, degrading, or prolonged, or if it involves an undue invasion of privacy." *Franklin v. Foxworth,* 31 F.3d 873, 876 (9th Cir. 1994). However, courts have found no constitutional violation when a plaintiff was required to remain in a bathroom, naked, under the supervision of a female officer but within view of male officers, until a protective sweep of the house was completed. *See Crosby v. Hare,* 932 F. Supp. 490, 494-95 (W.D.N.Y. 1996); *see also Los Angeles Cnty., California v. Rettele,* 550 U.S. 609, 614, 127 S. Ct. 1989, 167 L. Ed. 2d 974 (2007) (no Fourth Amendment violation where officers executed a warrant to search a home for suspects and temporarily detained the innocent occupants and ordered couple sleeping together in the nude out of bed at gunpoint).

"[T]he reasonableness of a search's scope depends only on whether it is limited to the area that is capable of concealing the object of the search." *Safford Unified Sch. Dist. No. 1 v. Redding,* 557 U.S. 364, 387 (2009) (Thomas, J. concurring in judgment and dissenting in part) (citing cases). Here, the search was prompted by the concerns Ogg articulated after viewing Bryan's and Francis' TECS records and knowing that the three Plaintiffs were traveling together. The searches were confined to each small cabin, where narcotics could have been concealed, and was properly limited in scope. Moreover, Defendants provided uncontroverted testimony from CBP Officer Demarais that occupants of a ship's cabin must be removed prior to a search by a drug-sniffing dog for the safety of both the dog and the cabin occupants. (Dkt. No. 168-6 at 5). The CBP officers had to "exercise unquestioned command of the situation" in order to do their job and minimize harm to everyone involved. *Michigan v. Summers,* 452 U.S. 692, 702-03 (1981). Their direction of Plaintiffs' movement—to get dressed, not to go in the bathroom, not to look at the search process, and to stand in the hallway—was not "sufficiently burdensome to violate [their] Fourth Amendment rights." *United States v. Lewis,* 674 F.3d 1298, 1311 (11th Cir. 2012).

Similarly, the officers' use of a drug-sniffing dog, and their use of a harsh or commanding tone of voice to tell the Plaintiffs what they could and could not do, are not unreasonable under the circumstances, in view of the fact that the officers needed to clear the cabins to enable the dog to conduct the search. In *United States v. Place*, 462 U.S. 696 (1983), the Supreme Court described the lower level of intrusiveness involved in a "canine sniff" by a narcotics detection dog, which

> does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of

---

*Id.* at 500-01. Based on this case law, the short time that Francis was nude did not involve an undue invasion of privacy and does not constitute a Fourth Amendment violation.

narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities
something about the contents of the luggage, the information obtained is limited.
This limited disclosure also ensures that the owner of the property is not subjected
to the embarrassment and inconvenience entailed in less discriminate and more
intrusive investigative methods.

*Id.* at 707; *see Int'l Islamic Cmty of Masjid Baytulkhaliq, Inc. v United States*, 981 F. Supp. 352,

369 (D.V.I. 1997) ("The use of a dog to search for narcotics is a standard procedure often used in

searches, and is clearly not enough to render the search unreasonable.") (quoting *United States v.*

*Sharpe,* 470 U.S. 675, 687 (1985)); *see also Montoya de Hernandez*, 473 U.S. at 542 (opining that

"'[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less

intrusive' means does not, in itself, render the search unreasonable.'") (citation omitted). In a

similar vein, the use of harsh and commanding tones of voice did not make the search

unreasonable, given that the officers had to "exercise unquestioned command of the situation" to

do their job. *Summers*, 452 U.S. at 703. Accordingly, the intrusion on Plaintiffs created by the use

of a narcotics-sniffing dog and the officers' use of harsh and commanding tones of voice, while

unpleasant, was not unreasonable.

Further, even assuming that directing Plaintiffs to stand in the hallway could be considered

a "detention," law enforcement interests—ensuring "the orderly completion of the search" in a

small area, and the public interest in protecting U.S. borders from the importation of contraband—

supported that procedure. *Id.* The detention was not overly intrusive: Plaintiffs were not placed in

restraints, were not threatened, were not questioned, and were not touched. They stood in an open

hallway, not in an enclosed space. Moreover, the detention lasted just a few minutes—only long

enough for the dog to search the cabins and no longer. Without trivializing its unpleasantness, this detention is a far cry from detentions that the Third Circuit has found unreasonable.[33]

Accordingly, the Court concludes that the search of Plaintiffs' cabins and their brief detention in the hallway were not unreasonable as a matter of law and did not violate Plaintiffs' Fourth Amendment rights. As a result, their *Bivens* claim fails on this ground as well.

## 5.  Conclusion

The Court finds that qualified immunity shields from suit the individual CBP officers named in Count Four of the Amended Complaint, because the requirement that a Customs officer must have reasonable suspicion to conduct a search of a passenger cabin on a cruise ship at the border was not clearly established at the time the lookouts were inputted and the search took place. Even if the reasonable suspicion standard had been clearly established, that would not alter the Court's conclusion that no constitutional violation occurred. In addition, the search of Plaintiffs' cabins and their brief detention in the hallway were not unreasonable and did not run afoul of Plaintiffs' Fourth Amendment rights. The Court will therefore award summary judgment to Defendants on the *Bivens* cause of action in Count Four of the First Amended Complaint.[34]

---

[33] In *Leveto v. Lapina*, 258 F.3d 156 (3d Cir. 2001), for example, where a search was found unreasonable, Internal Revenue Service agents executed a search of a doctor's office. The agents detained the doctor and his wife for almost eight hours, did not allow them to communicate with others, continually interrogated them, subjected the doctor to "the inconvenience and indignity of a forced ride with IRS agents to his home and back to his office," and "prevented [him] from responding to client needs." *Id.* at 169; *see also Love v. Johnson*, 2008 WL 2705479, at *1-5 (D.N.J. July 10, 2008) (finding that seizure was unreasonable where officers threatened to break down door of home unless it was opened and entered with guns drawn; older resident who suffered from health problems, wearing oxygen mask connected to machine, was required to move to another room without the machine, and died as a result; and there was no evidence that occupants of home were combative or uncooperative that would have caused officers to feel threatened).

[34] Relying on the one-year statute of limitations in Puerto Rico, Defendants argued in their Motion to Dismiss that the "aiding and abetting" claims raised in Count Four of the First Amended Complaint are barred by the statute of limitations. (Dkt. No. 51 at 16). Plaintiffs countered by

## C.  Federal Tort Claims Act Causes of Action

Plaintiffs have alleged three causes of action against the United States under the FTCA—invasion of privacy/intrusion on seclusion (Count One); false imprisonment (Count Two); and intentional infliction of emotional distress (Count Three). As a sovereign, the United States "is immune from suit unless it consents to be sued." *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 332 (3d Cir. 2012) (quoting *Merando v. United States*, 517 F.3d 160, 164 (3d Cir. 2008)). The FTCA "is a partial waiver of the sovereign immunity that would otherwise protect the United States from tort liability stemming from the actions of its employees. The express purpose of the FTCA is to make the United States liable 'in the same manner and to the same extent as a private individual under like circumstances . . .'" *Cestonaro v. United States*, 211 F.3d 749, 752-53 (3d Cir. 2000) (quoting 28 U.S.C. § 2674). The FTCA provides, in relevant part:

> [T]he district courts, together with the . . . District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). The cause of action in a FTCA claim "must come from state tort law." *CNA v. United States*, 535 F.3d 132, 141 (3d Cir. 2008) (citing *FDIC v. Meyer*, 510 U.S. 471, 478 (1994)). In that regard, "'the extent of the United States' liability under the FTCA is generally determined by reference to state law.'" *Reo v. U.S. Postal Serv*., 98 F.3d 73, 75 (3d Cir. 1996) (quoting *Molzof v. United States,* 502 U.S. 301, 305 (1992)).

---

arguing that the two-year statute of limitations in the Virgin Islands applies, and thus the claims are not time-barred. (Dkt. No. 56 at 14, citing Dkt. No. 35). Because the Court is granting summary judgment to Defendants on Count Four on grounds of qualified immunity, the statute of limitations argument raised in the Motion to Dismiss is moot.

The FTCA's waiver of immunity is tempered by several exceptions, which include "several important classes of tort claims." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984). One of those exceptions is relevant in this case: the "discretionary function exception," 28 U.S.C. § 2680(a).[35]

### 1. The Discretionary Function Exception

#### a. Standard

The discretionary function exception provides an exception to the FTCA's waiver of sovereign immunity for "[a]ny claim. . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). If the exception applies, the government's immunity remains intact. The Supreme Court has opined that "[t]he basis for the discretionary function exception was Congress' desire to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and

---

[35] The United States also argues that the customs detention exception to the FTCA applies here. This exception bars claims arising out of the "detention of any goods, merchandise, or other property by any officer of customs or excise or any other law enforcement officer[.]" 28 U.S.C. § 2680(c). The United States maintains that Plaintiffs' tort claims "arise directly from the CBP officers' official duties in inspecting and searching, or attempting to search, the cruise ship cabins and their contents. . . . Any harm or injury alleged by Plaintiffs arises directly out of the detention and inspection of their cabins and the contents therein." (Dkt. No. 95 at 10). However, "[c]ase law interpreting the detention of goods exception clarifies that it applies only where goods are damaged during or because of the detention." *Cervantes v. United States*, 330 F.3d 1186, 1189 (9th Cir. 2003) (citing, *inter alia*, *Kosak v. United States*, 465 U.S. 848, 849-50 (1984)). Conversely, without a detention of goods, the exception cannot apply. *See Gasho v. United States*, 39 F.3d 1420, 1434 (9th Cir. 1994) (in case involving seizure and detention of aircraft by Customs agents, the court opined that "the Customs exception in § 2680(c) does not bar an intentional tort claim arising out of arrests by Customs agents, as the exception applies only to the detention of goods and merchandise, not persons."). In this case, the record does not show that any goods, merchandise, or other property belonging to Plaintiffs were detained, much less damaged during the search. The Court therefore rejects the United States' customs detention exception argument.

political policy through the medium of an action in tort." *Berkovitz*, 486 U.S. at 536-37 (internal

quotation marks omitted).

The Third Circuit has noted that, before a court determines whether the discretionary

function exception applies, it must "identify the conduct at issue." *S.R.P.*, 676 F.3d at 332. Once

the conduct is identified, courts "must then follow a two-step inquiry to determine whether the

discretionary function exception immunizes the government from a suit arising out of such

conduct." *Id.* at 332-33. Under this approach, a court must first

> determine whether the act giving rise to the alleged injury and thus the suit involves
> "an element of judgment or choice." "The requirement of judgment or choice is not
> satisfied if a federal statute, regulation, or policy specifically prescribes a course of
> action for an employee to follow, because the employee has no rightful option but
> to adhere to the directive."

*Merando v. United States*, 517 F.3d 160, 164 (3d Cir. 2008) (quoting *United States v. Gaubert*,

499 U.S. 315, 322-23 (1991)). Second,

> even if the challenged conduct involves an element of judgment, the court must
> determine whether that judgment is of the kind that the discretionary function
> exception was designed to shield. . . . The focus of the inquiry is not on the agent's
> subjective intent in exercising the discretion conferred by statute or regulation, but
> on the nature of the actions taken and on whether they are susceptible to policy
> analysis.

*Id.* at 165 (quoting *Gaubert*, 499 U.S. at 322-23, 325). The second prong "'protects only

governmental actions and decisions based on considerations of public policy.'" *Gaubert*, 499 U.S.

at 323 (quoting *Berkovitz*, 486 U.S. at 537). The two-step inquiry is known as the "*Gaubert*" test.

If the discretionary function exception applies, a court is deprived of subject matter

jurisdiction. *Merando,* 517 F.3d at 162. Thus, "before suit may be maintained against the United

States, even for an intentional tort falling within the proviso, the plaintiff must first clear the hurdle

of the discretionary function exception." *Pooler,* 787 F.2d at 872.  Plaintiffs bear the burden of

demonstrating that their claims "fall within the scope of the FTCA's waiver of government

immunity," but the government bears "'the burden of proving the applicability of the discretionary function exception.'" *Merando*, 517 F.3d at 164 (citation omitted).

The discretionary function exception "does not encompass conduct which violates the Constitution, a statute or an applicable regulation." *Garcia v. United States*, 896 F. Supp. 467, 473 (E.D. Pa. 1994) (citing *U.S. Fidelity & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir. 1988)); *see also Pooler,* 787 F.2d at 871 ("[I]f the complaint were that agents of the government in the course of an investigation had violated constitutional rights or federal statutes, . . . federal officials do not possess discretion to commit such violations."); *Limone v. United States*, 579 F.3d 79, 102 (1st Cir. 2009). Consequently, "cases brought pursuant to the intentional tort proviso that involve conduct which violates the Constitution or a federal statute, regulation or policy will be able to surmount the discretionary function hurdle." *Garcia,* 896 F. Supp. at 473.

The United States argues that the discretionary function exception divests the Court of jurisdiction over Plaintiffs' FTCA claims. Plaintiffs counter that since the search and detention were unconstitutional, the discretionary function exception does not apply. The United States cited the *Gaubert* factors in making its arguments, but Plaintiffs focused only on their allegation that since the search of the cabins was unconstitutional, the discretionary function exception does not apply.

### b.  Analysis

To determine whether the discretionary function exception applies in this case, the Court must initially identify the challenged conduct. *S.B.P.,* 676 F.3d at 334. The challenged conduct here generally concerns the events leading up to and including the search of Plaintiffs' cabins—*i.e.*, inputting the lookouts into the TECS database which caused the agents to search the cabins, and the allegedly unreasonable manner of the search. The Court must first determine whether the

acts giving rise to the alleged injury involve "an element of judgment or choice"—whether a federal statute, regulation or policy specifically prescribes a specific course of action for Customs officers to follow when determining which cabins to search on a border entry and how to conduct the search, or whether the officers have discretion in that regard. *Merando*, 517 F.3d at 164.

The relevant statute and regulations governing the Customs officers' authority to search passengers are found in 19 U.S.C. § 1582 and its implementing regulations. Section 1582 provides that "all persons coming into the United States from foreign countries shall be *liable to detention and search* by authorized officers or agents of the Government[.]" (emphasis added).[36] Section 162.6 of the Code of Federal Regulations, which implements that statute, provides: "All persons, baggage, and merchandise arriving in the Customs territory of the United States from places outside thereof are *liable to inspection and search* by a Customs officer. . . *if such action is deemed necessary or appropriate*." 19 C.F.R. § 162.6 (emphasis added). Section 162.7 of the same Code of Federal Regulations states: "A Customs officer *may* stop, search, and examine any . . . person." 19 C.F.R. § 162.7 (emphasis added).

The language of the governing statute and regulations clearly indicates that all persons coming into the United States from foreign countries *may* be detained and searched by Customs agents, but those agents are not obligated to search everyone. The regulations explicitly accord Customs agents discretion in their decision of who and what baggage to search by permitting the agents to determine whether such action "is deemed necessary or appropriate," and otherwise

---

[36] In addition, 19 U.S.C. § 1581(a) provides that any customs officer "may at any time go on board of any vessel . . . within the customs waters . . . and examine the manifest and other documents and papers and examine, inspect, and search the vessel . . . and every part thereof and any person, . . . package or cargo on board[.]"

54

stating that Customs officers "*may* stop, search, and examine" any person. 19 C.F.R. §§ 162.6, 162.7.

Similarly, the Customs Directive No. 4320-003, contained in the record in this case, gives general guidelines for Customs officers in creating TECS records but does not mandate a specific course of action. *See, e.g.* ¶ 7(C): "TECS records should be created when the subject is *deemed to be* of enforcement interest." (Dkt. No. 108-21 at 7) (emphasis added).

The aforementioned statute, regulations, and guidelines lead inexorably to the conclusion that a Customs officer's decision of who to search—including the creation of TECS records—involves an exercise of judgment by the Customs officers. The plain text of the statute and regulations grants broad discretion to Customs officers in determining who to search and how to conduct the search. As the district court held in *Jackson v. United States*, 77 F. Supp. 2d 709 (D. Md. 1999), 19 U.S.C. § 1582 and its associated regulations

> give customs officers a great deal of latitude and require a broad range of choice as they decide whether to detain or search individuals who enter the United States.... Officers must determine which passengers will be searched, but the regulations provide no specific criteria. The statute and regulations authorize officers to detain and search certain passengers, but provide no details as to what types of searches and detentions are appropriate.

*Id.* at 714 (citations omitted). Since the statute and regulations do not prescribe a specific course of action for the officers to follow, the first prong of the *Gaubert* test is satisfied.

With regard to the second *Gaubert* factor—whether the actions taken are susceptible to policy analysis—the Court finds that the judgment exercised by Customs officers in deciding who to search at the border is a key element in fulfilling the mandate of the Customs & Border Protection agency to protect the integrity of our national borders. *See* Dkt. No. 97-1, U.S. Customs & Border Protection Snapshot Summary, stating that CBP's mission is to "steadfastly enforce the laws of the United States while fostering our nation's economic security through lawful

international trade and travel" and its strategic goals are "balancing trade and travel with security." Thus, CBP is delegated the task of ensuring that the border is secure, while at the same time facilitating trade and travel.

Courts that have considered the issue have concluded that border searches are susceptible to policy analysis and satisfy the second *Gaubert* factor. In *Bradley v. United States*, 164 F. Supp. 2d 437 (D.N.J. 2001), *aff'd* 299 F.3d 197 (3d Cir. 2002), the court observed that "[c]ourts have found that border searches clearly implicate public policy in that a decision to search an individual arriving from a foreign country relates to our nation's drug problems." *Id.* at 454 (citing *Garcia*, 913 F. Supp. 905, 909, 914 and *Jackson*, 77 F. Supp. 2d at 714). The court held that because the airport border search (a luggage search and pat down) was "conducted by customs officers who were using discretion and whose decisions were inherently based on public policy, this court is convinced that the discretionary function exception to the FTCA applies to defendants here." *Id.; see also Attallah v. United States*, 955 F.2d 776, 784 (1st Cir. 1992) ("[A]ccording to the statute and regulations, the agents are not obligated to stop and search every passenger. This function, we believe, is a discretionary function as defined by § 2680 of the United States Code. The words 'may stop, search, and examine' and 'are liable to inspection' indicate to us that there is room for choice on the part of Customs agents when carrying out their duties. This authority to discriminate among passengers is exactly the type of discretionary function that section 2680(a) sought to protect from liability."); *Jackson*, 77 F. Supp. 2d at 714 ("Border searches, in turn, clearly implicate broad questions of social, economic, and political policy, particularly in light of the vexing problem of drug smuggling."); *Atabayev v. United States,* 2012 WL 2149821, at *4 (S.D. Fla. June 12, 2012) (finding that government agents acted within their discretion when exercising judgment whether to arrest plaintiff, how to search plaintiff's vehicle, and presuming that these

actions were grounded in policy).[37] The searches at issue in this case arise out of the same policy concerns that prompted the searches in *Bradley*, *Jackson*, and *Garcia*, and thus satisfy the second prong of the *Gaubert* test.[38]

In short, the decision of who and how to search at the border is a textbook example of the discretionary function exception to the Federal Tort Claims Act. As the First Circuit concluded in *Attallahah*: "It is imperative that a Customs agent feel at liberty to exercise his/her discretion to search, or not, any passenger, without fearing legal repercussions." 955 F.2d at 784.[39] With both *Gaubert* prongs satisfied, the discretionary function exception applies and this Court is deprived of subject matter jurisdiction over Plaintiffs' FTCA causes of action.

---

[37] Because the relevant statute and regulations governing border searches provide Customs officers with the discretion to detain and search visitors, such searches are "presumed to be grounded in the policy underlying border searches." *Jackson*, 77 F. Supp. 2d at 714 This presumption has not been rebutted here. As discussed earlier, Plaintiffs' contention that the TECS lookout and resulting border search were prompted by retaliation is sheer speculation unsupported by any factual foundation in the record. *See* p. 43, *supra*.

[38] Even where the government is accused of exercising its discretion in a negligent manner, or abuses its discretion in that context, the discretionary function exception is still applicable. *Dalehite v. United States,* 346 U.S. 15, 33 (1953); *Shuler v. United States*, 531 F.3d 930, 935 (D.C. Cir. 2008) ("the discretionary function immunizes even government abuses of discretion."); *Timmerman v. United States*, 2012 WL 2052149, at *3 (D.P.R. June 5, 2012) (border agents' alleged negligent arrest of plaintiff fell under discretionary function exception).

[39] In this regard, courts have held that the decision regarding how to carry out an investigation is also protected under the discretionary function exception. *See, e.g., Nguyen v. United States,* 65 F. App'x 509, 509 (5th Cir. 2003) ("Decisions to investigate, how to investigate and whether to prosecute generally fall within this [discretionary function] exception."); *Sloan v. U.S. Dep't of Hous. & Urban Dev*., 236 F.3d 756, 762 (D.C. Cir. 2001) ("[T]he sifting of evidence the weighing of its significance, and the myriad other decisions made during investigations plainly involve elements of judgment and choice."); *Sabow v. United States*, 93 F.3d 1445, 1453 (9th Cir. 1996); *Horta v. Sullivan*, 4 F.3d 2, 21 (1st Cir. 1993) ("[A]lthough law enforcement agents have a mandatory duty to enforce the law, decisions as to how best to fulfill that duty are protected by the discretionary function exception to the FTCA."); *Pooler*, 787 F.2d at 871 (holding that "Congress did not intend to provide for judicial review of the quality of investigative efforts"); *Timmerman*, 2012 WL 2052149, at *3; *Reeves v. United States*, 809 F. Supp. 92, 95 (N.D. Ga. 1992), *aff'd* 996 F.2d 1232 (11th Cir. 1993).

Plaintiffs' argument to the contrary does not alter the Court's conclusion. Plaintiffs contend that because Defendants' conduct on September 6th and September 7th violated their constitutional rights, the discretionary function exception does not apply, and the Court should address Plaintiffs' FTCA claims on the merits. While the Court acknowledges that the discretionary function exception "does not encompass conduct which violates the Constitution, a statute, or an applicable regulation," *Garcia*, 896 F. Supp. at 473; *see also Pooler*, 787 F.2d at 871, the Court finds that no constitutional violation occurred here.

For purposes of the discretionary function exception analysis of whether a constitutional violation occurred, the Court must answer two questions: (1) with regard to Ogg's creation of the TECS lookouts, what was the governing law at that time; and (2) was the search reasonable?

In response to the first question, the Court finds that the *Whitted* reasonable suspicion standard did not apply to the September 6, 2008 cabin search on St. Thomas and to the aborted September 7, 2008 search in San Juan because, as discussed above, the *Whitted* Opinion was not final until the mandate issued in March 2009, approximately six months after the events at issue took place. *Mary Ann Pensiero, Inc.*, 847 F.2d at 97. As a result, the reasonable suspicion standard for passenger ship cabin searches at the border was not the law. Pre-*Whitted* Fourth Amendment routine border search jurisprudence weighed heavily in favor of the government (other than in circumstances where searches established as non-routine—such as body cavity searches—took place). *See Montoya de Hernandez*, 473 U.S. at 539-40 (opining that "not only is the expectation of privacy less at the border than in the interior, [but] the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more

favorably to the Government at the border.").[40] Against this backdrop of a strong governmental interest in protecting "the integrity of the border"—a concern that is "heightened by the veritable national crisis in law enforcement caused by the smuggling of illicit narcotics," *Montoya de Hernandez*, 473 U.S. at 538—and because pre-*Whitted* routine border searches could be conducted "not just without a warrant, but without probable cause, reasonable suspicion, or any suspicion of wrongdoing," *Whitted*, 541 F.3d at 485, the intrusion on Plaintiffs' Fourth Amendment interests in this case was not unreasonable.[41]

Even if the Court were to assume that the reasonable suspicion standard became the law on the day the *Whitted* Opinion was issued, that standard was met, as discussed above. The inputting of the lookouts was "justified at its inception," and did not violate the Fourth Amendment. *Terry*, 392 U.S. at 20.

With regard to the second question—whether the search was reasonable—the Court has affirmatively answered that question above concerning the September 6, 2008 search on St. Thomas. It comes to the same conclusion regarding the September 7, 2008 search in San Juan. The

---

[40] As the Third Circuit summarized in *United States v. Mora-Santana*, 99 F. App'x 397, 399 (3d Cir. 2004): "It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity. Accordingly, searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." (internal quotation marks and citations omitted).

[41] Also, as indicated above, Ogg inputted the lookouts in Puerto Rico, whose federal law is governed by the First Circuit Court of Appeals. To this day, First Circuit case law does not require reasonable suspicion for a border search of a cabin on a passenger ship. *Whitted*, on the other hand, was issued by the Third Circuit Court of Appeals, which governs federal law in the U.S. Virgin Islands. The fact that certain conduct might be held, overnight, to be unconstitutional in the Virgin Islands, but is not considered unconstitutional in Puerto Rico, further complicates the analysis. It is not inconceivable to conclude that CBP officers in the field would not have their finger on the pulse of new legal standards enunciated by the appellate court in a neighboring circuit. In addition, changes in their protocols to insure that TECS lookouts and searches met the new standard would require guidance in navigating these issues.

latter search was qualitatively less intrusive than the St. Thomas search. While there was a similar early morning bang on the cabin doors which were then opened, after which the officers told Bryan, Beberman, and Francis to get dressed and not to go into the bathroom, the supervisor then called off the San Juan search once he learned the cabins had been searched the previous day, and because Beberman was dressed only in a towel, was loudly protesting, and the team did not have a female CBP officer with them. During the episode, an officer did enter Francis' cabin and waited for further instructions. The entire incident took from three to ten minutes. (Dkt. No. 167-5, ¶¶ 67, 69, 70, 72; Dkt. No. 167-6, ¶¶ 76, 80).

Here, too, given that the essence of Fourth Amendment jurisprudence is the reasonableness of a search, the Court finds that, under the totality of the circumstances, the September 7, 2008 San Juan search was reasonable. In fact, it is a misnomer to call it a search since the cabins were not searched. The intrusion into the cabins (the knock and opening the doors) was prompted by the officers' reliance on the TECS lookouts. After the doors were opened, the purported search of Bryan's and Beberman's cabin ended. Although an officer did enter Francis' cabin, there was no actual search. None of the Plaintiffs were touched or were required to leave their cabins. The officers "exercise[d] unquestioned command of the situation" in order to do their jobs until the decision was made to call off the search. *Summers*, 452 U.S. at 702-03. Their direction of Plaintiffs' movement—to get dressed, not to go in the bathroom—and even the officer's entry into Francis' cabin, was not "sufficiently burdensome to violate [their] Fourth Amendment rights." *Id.*

The Court finds that, for purposes of the discretionary function exception analysis, no Fourth Amendment violation occurred in the way the September 6 and 7, 2008 searches were conducted. Accordingly, the Court finds that the discretionary function exception applies, which divests this Court of jurisdiction to adjudicate Plaintiffs' Federal Tort Claims Act causes of action.

The Court will therefore grant Defendants' Motion for Summary Judgment on Counts One, Two, and Three of Plaintiffs' Amended Complaint.

## IV.  CONCLUSION

For the reasons articulated above, the Court will grant Defendants' Motion for Summary Judgment on Count Four of the Amended Complaint on the ground of qualified immunity. The Court will grant Defendants' Motion for Summary Judgment on Counts One, Two, and Three of the Amended Complaint on the ground that the discretionary function exception applies, which divests this Court of jurisdiction to address these causes of action.

The Court will deny as moot Defendants' Motion to Dismiss. (Dkt. No. 50).

An appropriate Order accompanies this Memorandum Opinion.

Date: February 28, 2017

_____/s/_____
WILMA A. LEWIS
Chief Judge